Anthony BOOKER

v.

**BUDGET RENT–A–CAR SYSTEMS and Guy Grundman, individually and as an agent of Budget Rent–A–Car Systems, Inc.**

No. 3:94–0048.

United States District Court,
M.D. Tennessee,
Nashville Division.

July 13, 1998.

Robert Belton, Vanderbilt Law School, Joseph Howell, Johnston, Nashville, TN, for Plaintiff.

Matthew C. Lonergan, John Scannapiew, James Craig Olives from Bonet, Cummings & Berry, Martin H. Steckel from Wimberly, Lawson, Steckel, Nelson & Schneides, Nashville, TN, for Defendant.

## MEMORANDUM

NIXON, Chief Judge.

Pending before the Court is the Defendants' Motion for Summary Judgment (Doc. No. 40), to which the Plaintiff has Responded (Doc. No. 59), and the Defendants have filed a Reply. (Doc. No. 66.) For the reasons expressed below, this motion is granted in part and denied in part. In light of this ruling, Plaintiff's Motion for a Status Conference (Doc. No. 104) is denied.

## I. BACKGROUND

In this action, Plaintiff Anthony Booker alleges race discrimination under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981, as amended. Booker, who is black, was hired in 1979 as a Service Representative with a Nashville branch of Budget Rent–A–Car. In the following years he rose steadily through the ranks of Budget management, obtaining promotions to the positions of Lead Service Representative, Distribution Supervisor, Service Manager, Station Manager, and Local Market Manager. Throughout this period, Booker was the only black person serving in a supervisory position at his Budget branch. The only other black employees at Booker's site were three service workers.

In January of 1992, Defendant Guy Grundman was transferred to the position of general manager of Budget's Nashville operations. (Grundman Dep. at 25.) Grundman's first few months at Budget were, as far as Booker was concerned, relatively uneventful. (Booker Dep. at 41.) During this time, Booker and Grundman had a pleasant working relationship, although their interactions were minimal. (Booker Dep. at 41.) In fact Grundman publicly commended Booker during a general manager's meeting early in 1992, by reading out loud a letter written by one of the employees under Booker's supervision. (Booker Dep. at 43.) In the letter, the employee, Mitzi Keith, praised Booker for helping her through a difficult personal situation. (Id.) Grundman pointed to Booker's handling of the situation as an example of good management skills.

This cordial relationship between Grundman and Booker changed dramatically for the worse, however, in April of 1992. Around that time, Grundman, based on Booker's positive performance evaluations, and recommendations from Booker's supervisors, promoted Booker from Local Market Manager to Location Manager. (Grundman Dep. at 30.) This promotion made Booker an immediate subordinate of Grundman, and required Booker to report to Grundman directly. Shortly after this promotion, Booker, prompted by other managers' reports about Grundman's abusive behavior, began to keep a diary. (Booker Dep. at 54.) The diary entries recount numerous incidents of abuse by Grundman, many of which Booker relies on to establish his discrimination claims.

As reflected in the diary, Booker alleges that one of the first incidents of mistreatment occurred during the last days of March, when Booker returned from a vacation and was informed that Grundman had called in all of the managers late on the previous Friday night and demanded that they shuttle cars back and forth from the Budget locations. (Booker Dep. at 55.) This task was not completed until one o'clock the next morning. (Booker Dep. Ex. 1 at 1.) Grundman allegedly cursed at the managers who were present and criticized their performance, comparing them to the more diligent employees he encountered in Hawaii. Booker was not present because, being on a vacation, he could not be reached. When Booker returned to work on March 30, Grundman was allegedly upset at Booker's absence and stated that all the managers who could not be reached that past Friday would have to come in the following Friday to work. (Booker Dep. at 58 & Ex. 1 at 1.) Booker follows that entry with the comment: "Guy has changed since he started in Jan[uary].

He have [sic] meeting almost everyday constantly riding managers, *especially me.*" (Emphasis added.)

The next diary entry, dated April 15, 1992, tells of Grundman's announcement at a management meeting that the managers were prohibited from having a second job or going to school, because that would interfere with their responsibilities. He further indicated that the managers should be on duty 24 hours a day, 7 days a week, 365 days a year, if necessary. Booker again reports that Grundman frequently used foul language when communicating with the managers, and that he was offended by this because of his religious beliefs. He adds that the remainder of April was difficult because of Grundman's abuse. (Booker Dep. Ex. 1 at 2.)

On May 18, 1992, Booker reports in his diary that one of the managers, Amber Sisson, requested to be laid off because she was "fed up dealing with Guy." (Booker Dep. at 65.) Booker explained in his deposition that he recalled Amber's problem with Grundman to be related to the way that Grundman abused Booker. Sisson was one of several employees who left Budget or requested a demotion because Grundman was so difficult to work with. On June 15th, Barbara Barrett, the truck supervisor, requested a demotion so that she would be removed from Grundman's direct authority. (Booker Dep. at 7 .) Another employee, Russell Duggan, also decided to leave his managerial position at Budget because of problems he had with Grundman. (Duggan Dep. at 27–29.)

The remainder of the journal details several incidents in which Booker was verbally harassed by Grundman. On May 30, Grundman, upset at Booker because a customer at the Opryland location had been forced to wait four hours for a van, loudly cursed at Booker at the front counter in front of an hourly employee. Booker states that he was embarrassed by this outburst. Grundman purportedly stated that the incident with the van was Booker's "fucking responsibility," that Booker should not leave the "goddamn counter until the vans arrived," and that he would "take this goddamn location and show you how to fucking run it." (Booker Dep. Ex. 1 at 5.)

On June 22, Booker, Gaye Calloway, and Melody Goodwin were all called into Grundman's office to discuss Goodwin's incentive program. Grundman, apparently upset at the way the incentive program had been structured, loudly berated and cursed at Booker and Calloway. Booker stated that Grundman's verbal abuse was so extensive that one of the customer service representatives indicated that a customer had observed the altercation and had been disturbed by it. (Booker Dep. Ex. 1 at 10.) Melody Goodwin was so upset by the incident that she started crying. (Booker Dep. at 83.) There were other instances in which Grundman's conduct was observed by customers or other employees. On July 23, Booker recorded an incident in which, while he was at the Opryland location helping a customer Grundman called him and asked to see him. Booker asked to call him back after he was finished with the customer. Grundman allegedly replied, "I don't give a fuck. You got 5 min. to get out here ...." The customer commented to Booker that it seemed that Grundman was giving him a "hard time." (Booker Dep. Ex. 1 at 12.)

On July 9th, Booker reports that Grundman gave Booker a written reprimand. (*See* Booker Dep. Ex. 2.) Booker agreed with some of the criticisms mentioned in the reprimand but not with others.

The journal also details several incidents in which Grundman cursed at Booker and verbally berated him because the rental locations had exceeded the revenue goals, and Grundman was forced to pay out incentive bonuses. The first time the matter was discussed with Booker was on August 1, through a phone call initiated by Grundman to Booker's residence at two in the morning. Grundman was purportedly "yelling and cursing and never said good job or anything to that effect." The following day, Grundman and Booker together implemented increased revenue goals for the car and rental truck locations for the remainder of the year. However, Grundman again verbally harassed and cursed at Booker at the end of August because the locations had once again exceeded their revenue goals and Grundman was

forced to pay out the incentives. (Booker Dep. at 99–100 and Ex. 1 at 12–16.)

On September 8, 1992, Booker was informed that the vacation he had scheduled beginning September 14 and which had been approved in August had been canceled. (Booker Dep. at 101, 104 and Ex. 1 at 16–17.) Booker was told that the instructions to cancel all vacations until November had been given by the corporate headquarters. (Booker Dep. at 104.) The reason given was that since Budget was losing money, managers should not be allowed to take vacations. (Booker Dep. at 105.)

Booker's journal reflects at least two instances in which he was singled out from the other managers. On November 30, 1992, Booker recounts that he found out that all of the managers who reported directly to Grundman, except for him, were asked to fill out a questionnaire which inquired as to Grundman's management skills. Booker reports that although the completion of the questionnaires was not mandatory, he felt that he was discriminated against by not being given the opportunity to fill one out. (Booker Dep. Ex. 1 at 21.) Again, on December 13, Booker writes about the company Christmas party at the Opryland golf course, where Grundman indicated in a speech that the Nashville employees had a tough year, but that they had worked hard. Grundman proceeded to mention every manager's name with the exception of Booker, although people from the audience were asking for Booker to be recognized. Booker wrote that the incident was "very embarrassing" for him, particularly since his wife was there with him. (Booker Dep. Ex. 1 at 22.) On December 15, Booker, recalling these two incidents, writes, "I thought to myself that Guy really hates me." (Booker Dep. Ex. 1 at 23.)

On December 23, Booker indicates that Grundman called him late in the day, "cursing any yelling" because Booker decided to close the truck location on the next day, Christmas eve. Booker states that his decision to close the truck location was influenced by the fact that no reservations existed for that day, and his desire to comply with Grundman's directive a few days earlier to try to keep the costs down wherever possible. Grundman cursed at Booker, indicating that he would not be able to meet revenue goals if Booker continued to close locations. (Booker Dep. Ex. 1 at 26.) This behavior contradicted Grundman's earlier displeasure at the fact that the locations had exceeded their revenue goals and that he was forced to pay out incentive bonuses.

The last instance of verbal harassment detailed in the journal occurred on December 26, when Grundman called Booker in from his vacation and berated him because one of the locations was short by fifty cars. Booker replied that he was aware of the problem, but that he had also been informed that there was a high number of no-shows. Grundman reportedly demanded that Booker explain to the customers the car situation. Booker describes Grundman as a "mad man" and "hysterical," and indicates that other employees were in agreement with his characterization of Grundman's behavior. (Booker Dep. Ex. 1 at 29–30.) However, Booker also states that Grundman came back later in the day and praised Booker for the way he had corrected the situation.

The last incident detailed in the journal is Booker's "demotion on January 19, 1993, from his position as Location Manager to the position that he had held three years earlier, airport Station Manager. A white male, James Bearden, was promoted to fill the Location Manager position. Grundman explained that his decision was based on Booker's work performance, though Booker asserts that he reviewed his personnel file and was only able to locate one negative write-up in his fourteen years of service." (Booker Dep. Ex. 1 at 31–33.) Booker alleges that Bearden had less experience and was not as qualified as Booker. In response to this action, Booker filed an EEOC charge in February 1993 wherein he detailed Grundman's harassing conduct.

Bearden resigned from the position of Location Manager on April 12, 1993.[1] Booker

1. Booker points to Bearden's brief tenure as Location Manager as further evidence of his defi-

cient qualifications for the job.

applied for his old job, but it was awarded to a white woman instead. Booker contends that this woman had fewer qualifications and less experience than he did. Booker amended his charge in April 1993 to include an allegation that he was denied this promotion because of his race.

In response to Booker's complaints to the EEOC, an on-site investigation by the agency occurred. Shortly after this visit, in the Spring of 1993, Grundman resigned as General Manager. Grundman cited job stress as the reason for his resignation. Following Grundman's departure, Booker claims that he was retaliated against in the form of a negative performance evaluation by David Ritz, Grundman's successor, Booker's first during his tenure at Budget. Ritz' evaluation was considerably lower than one that had been partially completed by Al Bryant, the Acting General Manager prior to Ritz' appointment to that position. Ritz contends that the lower evaluation was due to the fact that he used different evaluation standards. However, Booker points out that this evaluation relates to Booker's performance prior to Ritz' tenure as General Manager, and thus that Ritz did not have any personal knowledge of Booker's performance during that time period. Ritz admits that he did not consult with Bryant before evaluating Booker. (Ritz Dep. at 13–19.)

In August 1993, the EEOC issued a determination finding that Booker had been harassed and denied a promotion because of his race. Booker filed this action on January 18, 1994.

In September 1997, this Court granted in part and denied in part Defendant Guy Grundman's Motion to Dismiss, concluding that Grundman's bankruptcy impeded monetary damages against him individually, but not declaratory relief.

## II. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides in part that summary judgment is proper if there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." A genuine issue of material fact is one which, if proven at trial, would result in a reasonable jury finding in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

While the moving party bears the initial burden of proof for its motion, the party that opposes the motion has the burden to come forth with sufficient proof to support its claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Thus, the non-movant may not rely solely on conclusory allegations, but rather must come forward with affirmative evidence which establishes its claims and raises an issue of genuine material fact. *Id.* at 324, 106 S.Ct. 2548. The court must construe the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. DISCUSSION

### A. Racial Harassment

The existence of racial harassment in the workplace is proscribed by both Title VII and 42 U.S.C. § 1981, the statutes under which the Plaintiff brings his claims. The language in Title VII which makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment," 42 U.S.C. § 2000e–2(a)(1), has been interpreted to encompass discrimination in the form of racial harassment. *Patterson v. McLean Credit Union,* 491 U.S. 164, 180, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). Similarly, Section 1981's pronouncement that "[a]ll persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts," as amended by the Civil Rights Act of 1991, also prohibits racial harassment in the workplace. Although in *Patterson, supra,* the Supreme Court concluded that the term "make and enforce contracts" did not encompass conduct arising "from the conditions of continuing employment" within the meaning of Section 1981, 491 U.S. at 176, 109 S.Ct. 2363, Congress acted in 1991 to overturn this part of the decision as well other narrow interpre-

tations of Section 1981 by the Supreme Court. *See Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999, 1008 n. 17 (11th Cir.1997) (and cases cited therein); *Dennis v. County of Fairfax,* 55 F.3d 151, 155 (4th Cir.1995); *Johnson v. Uncle Ben's, Inc.,* 965 F.2d 1363, 1372 (5th Cir.1992). Specifically, the amendments to the Civil Rights Act which were enacted in 1991 define the term "make and enforce contracts" as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b); Civil Rights Act § 101. However, the Sixth Circuit has concluded that the amendment does not have retroactive effect. *Vogel v. City of Cincinnati,* 959 F.2d 594, 598 (6th Cir.1992). Accordingly, only instances of racial harassment which occurred after November 21, 1991, the date the Civil Rights Act of 1991 took effect, are actionable under Section 1981. As the Plaintiff's alleged discrimination took place from 1992 through 1993, his racial harassment claims may also be brought under the rubric of Section 1981.

■ Both Title VII and Section 1981 claims are governed by the same proof structure. *Patterson v. McLean Credit Union,* 491 U.S. 164, 186–87, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); *accord Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992). In order to succeed on a hostile environment claim under either statute, a plaintiff must prove the following elements:

> (1) the employee is a member of a protected class; (2) the employee was subject to unwelcomed [racial] harassment; (3) the harassment complained of was based on [race]; (4) the charged [racial] harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive work environment . . .; and (5) there exists respondeat superior liability.

*Fleenor v. Hewitt Soap Co.,* 81 F.3d 48, 49 (6th Cir.1996) (quoting *Rabidue v. Osceola Refining, Co.,* 805 F.2d 611, 619–20 (6th Cir. 1986)); *see also Harrison v. Metro. Government of Nashville,* 80 F.3d 1107, 1118 (6th Cir.1996) ("[T]he elements and burden of proof that a Title VII plaintiff must meet are the same for racially charged harassment as for sexually charged harassment.")

Defendants advance three arguments to support their claim that Booker's racial harassment claims should be dismissed. First, Defendants assert that even if Grundman's treatment of Plaintiff is considered "harassing," Defendants allege that Grundman harassed all employees equally, and did not single out Plaintiff out because of his race. Second, Grundman's harassment of Plaintiff did not rise to an illegal level under Title VII. Finally, assuming that Grundman did illegally harass Plaintiff, Budget did not receive sufficient notice of this harassment, so liability may not attach.

### 1. *Was harassment based on race?*

■ The Defendants first allege that the harassment experienced by Plaintiff was not racially-motivated because, as Plaintiff himself admits, Grundman was generally abusive towards all the managers. At least three white employees felt compelled to resign their positions because of Grundman's abusive behavior. Furthermore, Defendants point out that any racially derogatory statements attributed to Grundman are not sufficient to establish discrimination on the basis of race, as the comments were too infrequent and remote to infer discriminatory animus into Grundman's treatment of Booker.

Defendants further contend that Booker cannot establish a claim for racial harassment based on proof that Booker was abused more severely by Grundman because of his race. In this respect, Defendants assert that while Russ Duggan, a manager who quit because of Grundman's behavior, testified in his deposition Grundman targeted Plaintiff "a little bit more than the rest of [the managers]," other testimony by Duggan disproves that this differential treatment was racially motivated. For example, Duggan testified that one reason he believed Grundman to be particularly hostile towards Booker was because Booker was the manager of Melody Goodwin, who was dating Grundman and did not like Booker. (Duggan Dep. at 19.) Furthermore, Grundman asserted that Grundman's desire to improve performance in the truck operation business also made him par-

ticularly hostile towards Plaintiff. This impacted Booker disproportionately because the improvement of truck operation business fell squarely within Booker's job responsibility and not of the other managers. (Duggan Dep. at 82.) Finally, Defendants note that despite Grundman's harsh treatment of Booker, Grundman took some positive employment actions towards Booker. Specifically, four months after Grundman became General Manager of the Tennessee/North Alabama region, Grundman promoted Booker to the position of Location Manager. Grundman also chose to transfer Booker instead of terminating him during the company-wide reorganization which resulted in Booker's assignment to the airport Station Manager position.

Defendants correctly state that in order to succeed on a racial harassment claim, Booker must prove that he was harassed because of his race. *See Vore v. Indiana Bell Tel. Co., Inc.,* 32 F.3d 1161, 1164 (7th Cir.1994) (no actionable racial harassment where black employee was vulgar to all employees, not just white employees); *see also, Rabidue,* 805 F.2d at 620 ("[I]nstances of complained of sexual conduct that prove equally offensive to male and female workers would not support a Title VII sexual harassment charge because both men and women were accorded like treatment."). It is also true that Grundman's abusive treatment, as documented in the record and undisputed by the parties, was directed at all of the supervisors. However, there is ample evidence in the record to support a finding that Grundman was not colorblind in dispensing his criticisms. At least two employees, Russell Duggan and Amber Sisson, expressed concern that Grundman treated Booker more harshly than the other managers because of racial animus. Duggan, in a statement given to the Equal Employment Opportunity Commission ("EEOC") dated January 23, 1993, expressed that after Booker's promotion to Local Market Manager, Grundman "began what seemed like a never-ending assault on Anthony [Booker] .... It appeared to me that Guy was intentionally focusing his attentions on Anthony and more likely there was prejudice involved." (Duggan Dep. Ex. 1.) Duggan's conclusion that Grundman was motivated by racial animus was based on several instances in which he overheard racially derogatory remarks being made by Grundman. Specifically, Duggan testified as follows:

> For example, I was in his [Grundman's] office one morning and he was looking out the window and pointed to the black service agents and remarked how lazy they were and how slow they worked and said that was typical of blacks. At that point he made a comparison about some Vietnamese workers I had and said that they were much better workers and that he wished he could get rid of the 'niggers' and hire some more Vietnamese workers. On another occasion he referred to Anthony as his "whipping boy" and said he didn't know who he would "fuck with" if Anthony left. On occasions where Guy would need to communicate throughout the operation he would present it to me in a rational manner, the same information would be communicated to Anthony in a more sarcastic, demeaning form. Guy in a closed door session with me and James Bearden, said that he wanted to get Anthony to quit because it would be difficult to fire him because he was black.... I cannot specifically recall any other instances of discrimination but my opinion through numerous remarks made by Guy was that he was prejudiced and his intention was to get Anthony to quit instead of firing him. It also appeared that the write-ups that he gave Anthony, in most circumstances, were very contrived and if they were applied equally, several other managers should have been written up for the same things.

(Duggan Dep. Ex. 1.) Duggan further testified in his deposition that he discussed in general terms Grundman's treatment of Booker with Budget's regional Human Resources Manager, Donna Sosnowski, in an exit interview that she conducted prior to his departure. Sosnowski documented Grundman's generally abusive behavior in a memorandum to Mike MacDonald, the Regional Manager and one of Grundman's supervisors, though she did not include any statements about Grundman's conduct particular to Booker. (*See* MacDonald Dep. Ex. 1.) The former Local Market Station Manager, Am-

ber Sisson, also was under the impression that Grundman was more hostile to Booker than to his other supervisors, and expressed concern that this was due to racial motivations. In an undated letter to MacDonald,[2] Sisson wrote, "Talk about a favorite whipping boy, Mr. Booker could probably sue the pants off of Budget for discrimination after Guy is finished with him. I sure hope it is not because he's black, that he gets this treatment." (Sisson Aff. Attach. A.)

Duggin and Sisson's observations of Grundman's disproportionate abusive treatment of Booker, coupled with the racially discriminatory statements allegedly made by Grundman, taken as true, could convince a reasonable juror that Booker was harassed because of his race.[3] The Court does not make this conclusion based on the existence of the racial epithets alone, as only at the most three within a one-year period were alleged. However, if indeed Booker was treated particularly harshly by Grundman, and Grundman did utter racial epithets[4] and indicate that he wanted to get Booker to quit because he is black, it is possible that a reasonable juror could conclude that Grundman's harassment of Booker was racially motivated. *See Cowan v. Glenbrook Sec. Servs., Inc.,* 123 F.3d 438, 444 (7th Cir.1997) (Even where supervisor mistreats all employees, evidence that supervisor treated African–American employees more harshly than employees of other races can demonstrate harassment due to race.). Thus the question of whether Booker was harassed due to his race is one of material fact and inappropriate for summary judgment.

### 2. Was harassment severe and pervasive?

▮▮▮ Title VII prohibits the maintenance of a "workplace [which] is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). In order to prove a hostile environment claim, a plaintiff must be able to show more than a "mere utterance of an ... epithet which engenders offensive feelings in an employee," as this "does not sufficiently affect conditions of employment" to constitute actionable harassment. *Harris,* 510 U.S. at 21, 114 S.Ct. 367. Rather, the alleged incidents must occur "either in concert or with a regularity that can reasonably be termed pervasive." *Lopez v. S .B. Thomas, Inc.,* 831 F.2d 1184, 1189 (2d Cir.1987).

**2.** The letter is stamped as being received by the EEOC on February 17, 1993.

**3.** In this respect, the Court notes that the racial epithets allegedly uttered by Grundman are not hearsay statements which are inadmissible in Court. These statements would not be introduced to prove the truth matter asserted therein—i.e., that African–Americans are "niggers" or that Booker was Grundman's "whipping boy"—but only as evidence of the racial attitude of the declarant. As such, they are not considered hearsay under Federal Rule of Evidence 801(c). *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1249 (6th Cir.1995). Furthermore, Grundman's statement that he wanted Booker to quit because he is black, though hearsay within the meaning of Rule 801(a) is properly admissible under the hearsay exception applicable to statements by a party opponent. Fed.R.Evid. 801(d)(2). Rule 801(d)(2) expressly excludes as hearsay an admission made by a party-opponent. A statement offered against a party which was made "by the party's agent or servant concerning a matter within the scope of the agency or em-

ployment, made during the existence of the relationship," is considered to be an admission by a party-opponent. Fed.R.Evid. 801(d)(2)(D); *see also Mitroff v. Xomox Corp.,* 797 F.2d 271, 275 (6th Cir.1986) ("[A] statement of an agent or employee may be admissible against the principal ... but a proper foundation must be made" to show that the statement was made "within the scope of his agency or employment."). Because Grundman was in a managers' meeting discussing his particular management goals, discriminatory as they were, at the time this statement was allegedly made, the Court concludes that it was said within the scope of Grundman's employment.

**4.** The Defendants dispute that the term "whipping boy" should not be considered derogatory to African–Americans as a group, as it is commonly used to refer to a "scapegoat," and has no racial connotations whatsoever. However, it seems that at least Duggin and Booker believed this phrase to be a racial epithet and thus that the nature of the phrase "whipping boy" is a material question of fact.

The pervasiveness requirement incorporates both an objective and a subjective component. The court must first determine whether the plaintiff himself perceived the environment to be pervasively hostile, then whether a reasonable person under these same conditions would perceive it as such. *Faragher v. City of Boca Raton,* —— U.S. ——, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (No. 97–282) (citing *Harris,* 510 U.S. at 22, 114 S.Ct. 367). In making this determination, the court must consider the "totality of the circumstances," including such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's psychological well-being." *Id.* (citing *Harris,* 510 U.S. at 23, 114 S.Ct. 367). The effect of the abuse on the employee's psychological well-being is a relevant factor, but psychological harm is not necessary to state an actionable claim of racial harassment. *Harris,* 510 U.S. at 23, 114 S.Ct. 367.

The Defendants argue that applying these standards, Booker has not shown a sufficiently hostile work environment to prevail on his claims. The Defendants contend that Grundman's alleged conduct does not rise beyond being episodic, pointing out that out of 36 entries in the journal kept by Booker for the purpose of documenting racial harassment, only 12 deal with verbal abuse, and none involve threats to Booker's well-being. Moreover, the Defendants aver that at least some of Grundman's criticisms of Booker's performance had a basis in fact. For example, Booker testified in his deposition that he agreed with some of the criticisms listed in Grundman's written reprimand dated July 9, 1998, and believed that he could remedy the others.

Viewing the record as a whole, however, the Court concludes that Grundman's harassment meets the severe or pervasive standard under both the subjective and objective prongs of the *Harris* test. With respect to the first prong, Booker clearly subjectively experienced the environment as hostile because he sought medical treatment for stress, anxiety, and hypertension. He also sought and obtained counseling from his pastor regarding his problems with Grundman. (Booker Aff. ¶ 16.) Finally, in November of 1993, he was forced to take time off from work to tend to the medical ailments which he alleges were caused by his stressful work environment. (Booker Aff. ¶ 18.) The fact that Booker continued to work at Budget, and did not seek to leave—as some white employees did as a result of Grundman's abuse—does not undercut the subjective harm suffered by Booker. Booker does not have to show serious psychological harm to satisfy the subjective prong; but only that the harassment was in fact subjectively felt such that the conditions of his employment were actually altered. *Harris,* 510 U.S. at 21, 114 S.Ct. 367.

As to the objective test, Plaintiff has sufficiently set forth facts which show an environment that a reasonable person would find racially abusive. Applying the factors enumerated in *Harris* as being relevant to the question of harassment, the Court notes that the harassment as alleged by Booker was frequent, severe, and humiliating. Booker was under the direct supervision of Grundman from April of 1992 through January of 1993, when Grundman transferred him to the position of airport manager. During this ten month period, Booker can recount ·at least twelve instances in which he was the target of verbal harassment by Grundman, as well as various instances of verbal abuse directed towards managers in general. Grundman himself admits in his deposition that he frequently used profanity, and that he lost his temper on so many occasions that he could not recall any incident in particular. (Grundman Dep. at 72–74.) He did not deny that in his interactions with Booker, he frequently cursed at him. (*See, e.g.,* Grundman Dep. at 74–75.) The Court finds that the frequency of harassment experienced by Booker is extensive enough to support a claim for racial harassment.

Moreover, Booker's allegations, taken as true, are also sufficient to establish that the harassment was severe and humiliating. In several of his journal entries, Booker notes instances in which Grundman made an employee, Melody Goodwin, cry, when he acted

like a "mad man" and was "hysterical," and when he was so loud and hostile towards Booker that customers and other employees became concerned. Booker also alleges that he was often humiliated by Grundman's conduct, particularly when he reprimanded him in front of lower-level employees and when he failed to acknowledge Booker at the company-wide Christmas party.

Thus, the Court concludes that Booker has made an actionable claim for racial harassment under both Title VII and Section 1981. The Defendants' contention that Grundman protected Booker from being dismissed during some company-wide reorganizations, and was justified in some of the criticisms he directed at Booker does not militate against this finding. Rather, Grundman's non-harassing and even favorable treatment of Booker is relevant to the question of whether race was a motivating factor in Grundman's treatment of Booker, or whether, as Defendants assert, was only a part of Grundman's generally abusive management style. This, as discussed before, is a question of fact for the jury. However, the Court has determined that the harassment, apart from the question of whether or not it was motivated by racial animus, is sufficiently hostile and pervasive to defeat summary judgment.

### 3. *Did Budget have sufficient notice of the harassment?*

The Supreme Court's recent pronouncements in *Faragher v. Boca Raton, supra,* and *Burlington Industries, Inc., v. Ellerth,* —— U.S. ——, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (No. 97–569), clarified the standards to be used by courts in determining the extent to which employers are liable for the harassment perpetrated by supervisory personnel. Prior to *Faragher* and *Burlington,* the Sixth Circuit had established that an employer could be liable for a supervisor's harassing conduct regardless of whether the employer was aware of it, deeming the supervisor the employer's alter-ego, or agent. *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 803 (6th Cir.1994). Liability attached as long as "the supervisor's harassing actions were foreseeable or fell within the scope of his employment and ... [if the employer did

not] respond[ ] adequately and effectively to negate liability." *Id.* When the harasser was a co-worker, the standard of responsibility was relaxed, making an employer responsible only if the employer "knew or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action." *Id.* at 804 (quoting 29 C.F.R. § 1604.11(d)). In a co-worker harassment case where the employer did take prompt corrective action, the employer could be liable "only if its response manifest[ed] indifference or unreasonableness;" mere negligence was not enough. *Blankenship v. Parke Care Centers, Inc.,* 123 F.3d 868, 873 (6th Cir. 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998) (No. 97–906).

In *Faragher* and *Burlington,* the Supreme Court revisited the question of employer liability only as it relates to harassment by supervisors. The Court reiterated in these decisions its prior holding in *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), that agency principles controlled this issue. Noting that the circuits, in applying agency law, had come to diverging conclusions with respect to the degree to which an employer should be held responsible for conduct by supervisors of which it was not aware, the Court distinguished supervisor harassment that resulted in a tangible employment action from that which does not. *Faragher,* 118 S.Ct. at 2292–93; *Burlington,* 118 S.Ct. at 2271. When a tangible employment action is taken, vicarious liability is always appropriate. *Faragher,* 118 S.Ct. at 2291–92; *Burlington,* 118 S.Ct. at 2266–67. However, when there has been no tangible adverse employment action, the Court implemented the following test:

An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence .... The defense comprises two necessary elements: (a) that the employer exercised

reasonable care to prevent and correct promptly any [racially] ... harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Faragher*, 118 S.Ct. at 2292-93; *Burlington*, 118 S.Ct. at 2271. The Court defined a tangible employment action as one which "constitutes a significant change in employment status, such as hiring, different responsibilities, or a decision causing a significant change in benefits." *Burlington*, 118 S.Ct. at 2266-67. In the present case, it is clear that a tangible employment action was taken at least when Grundman demoted Booker. Booker alleges that his reassignment, while not affecting his action salary, decreased his maximum salary grade; diminished his level of authority; and required him to work some weekends and nights instead of having the regular weekday schedule his former position permitted. (Booker Aff. ¶¶ 6–9.) Accordingly, applying the *Faragher/Burlington* standard, Budget is automatically liable for Grundman's harassment.

 However, even if this was not the case, Budget would still be vicariously liable because it cannot prove its affirmative defense required under *Faragher/Burlington*. First, with respect to whether Budget "exercised reasonable care to correct and prevent promptly" the racial harassment, Budget has identified a harassment policy in its employment manual which states that "[t]he company will not tolerate inappropriate verbal or physical conduct by any employee of any other employee .... includ[ing] conduct based on the other employee's race[,] ... which harasses, disrupts, or interferes with another's work performance or which in any way creates an intimidating, offensive or hostile work environment." (McDonald Dep. Ex. 7.) However, Budget has not come forth with proof that this policy was ever distributed to employees, or that management ever received any kind of training with respect to issues of racial harassment. Accordingly, Budget has not proved by a preponderance of the evidence that it exercised "reasonable care to prevent" racial harassment.

Furthermore, Budget has not met its burden of proving that it reasonably and promptly corrected any complaints of racial harassment. In at least three instances, Budget had notice that Booker was being singled out for mistreatment by Grundman. First, there is testimony from Russell Duggan that he informed Donna Sosnowski, the Human Resources manager, about Grundman's treatment of Booker. (Duggan Dep. at 29.) Duggan does not specify the particulars of his conversation with Sosnowski, but indicates that he would have expected her, based on this information, to have investigated more thoroughly his allegations. Sosnowski, a few days later, includes some of the concerns expressed by Duggan in a Memorandum intended for Mike MacDonald, but does not make mention of the harassment specifically directed at Booker. Furthermore, the Plaintiff has submitted a letter written by Amber Sisson to MacDonald, wherein she suggests that Grundman's treatment of Booker was racially motivated. Although the date the letter was received by MacDonald is not clear, the Defendants have not submitted any proof that this letter was not received, or that it was received after Grundman had already left Budget. Third, Booker indicates in his journal that on November 1, Gaye Calloway spoke with Barry Durkin, the Regional Director of Sales, about the manner in which Grundman verbally abused them during the incident involving Melody Goodwin's incentive package. Booker notes in his journal that he believed the "higher ups" were aware of Grundman's actions. (Booker Dep. Ex. 1 at 18.) Although Durkin may not have been informed that Grundman may have been targeting Booker because of his race, the Court finds that these three incidents should have given Budget notice that a situation involving potential racial harassment was present, and Budget's failure to take prompt action prevents it from asserting an affirmative defense against vicarious liability.

Finally, Budget has not proved that Booker unreasonably failed to utilize the opportunities provided by Budget to report and seek to correct his situation. Again, Budget has not asserted that it gave Booker a copy of the "harassment" policy, or that anyone

spoke to him regarding this policy. Furthermore, Duggan testified that he had been afraid to speak to anyone about Grundman's behavior because he feared retaliation. (Duggan Dep. at 62.) Given the atmosphere at Budget, it has not been established by a preponderance of the evidence that Booker was unreasonable in not reporting the harassment given other employees' fears about retribution.

### B. *Racial Discrimination*

■ To state a claim for racial discrimination, a plaintiff may provide direct, indirect, or circumstantial evidence of discrimination. *Woythal v. Tex–Tenn Corp.,* 112 F.3d 243, 246 (6th Cir.1997) (quoting *Gagne v. Northwestern Nat'l Ins. Co.,* 881 F.2d 309, 314–15 (6th Cir.1989) (citation omitted), *cert. denied,* —— U.S. ——, 118 S.Ct. 414, 139 L.Ed.2d 317 (1997) (No. 97–426)). The direct and circumstantial evidence approaches are mutually exclusive—the plaintiff may prove his case under either method. *Kline v. Tennessee Valley Authority,* 128 F.3d 337, 348–49 (6th Cir.1997).

A plaintiff with credible direct evidence of discrimination has in effect proved that race was a motivating factor in the adverse employment decision against him. Once direct evidence has been accepted by the court, the burden shifts to the defendant to prove by a preponderance of the evidence that the same employment decision would have been made in the absence of the discriminatory motive. *Terbovitz v. Fiscal Court of Adair County, Ky.,* 825 F.2d 111, 114 (6th Cir.1987), *abrogated on other grounds, Price Waterhouse v. Hopkins,* 490 U.S. 228, 256, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Since the implementation of the 1991 amendments to the Civil Rights Act, liability automatically attaches after a finding of direct discrimination—the defendant's establishment of its affirmative defense only serves to limit some of the remedies available to the plaintiff. *Smith v. City of Dayton,* 830 F.Supp. 1066, 1075 n. 8 (S.D.Ohio 1993), *aff'd,* 37 F.3d 1499, 1994 WL 540666 (6th Cir.1994). Specifically, the defendant may seek to limit the remedies sought to a declaratory judgment, injunctive relief, or attorney's fees. *Browning v. Presi-*

*dent Riverboat Casino–Missouri, Inc.,* 139 F.3d 631, 634 (8th Cir.1998).

If a plaintiff lacks direct evidence, a jury may still infer discriminatory intent under the burden-shifting framework adopted under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dep't of Comm. Affs. v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). According to this approach, a plaintiff may state a *prima facie* case of race discrimination by presenting evidence that (1) he is a member of the protected class; (2) he is qualified to do the job; (3) despite these qualifications, he suffered an adverse employment action; and (4) that the position was filled by someone not a member of the plaintiff's protected class. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. Once these four elements are proven, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Id.* At this point only the burden of production passes to the employer, and not the burden of proof. *Gagne v. Northwestern Nat. Ins. Co.,* 881 F.2d 309, 314 (6th Cir.1989). If the defendant carries this burden, the plaintiff must then produce "sufficient evidence to allow a jury to reasonably reject [the employer's] explanation" as a pretext for discrimination, *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817, and to instead conclude that the plaintiff's race played a determinative role in the adverse employment decision. *Phelps v. Yale Sec. Inc.,* 986 F.2d 1020, 1023 (6th Cir.1993). The Supreme Court in *St. Mary's* made clear that "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." 509 U.S. at 518, 113 S.Ct. 2742. Moreover, the Court held that "[i]t is not enough . . . to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Id.* at 519, 113 S.Ct. 2742 (emphasis added).

#### 1. *January 1993 Demotion*

The first instance of discrimination alleged by Booker which resulted in an adverse em-

ployment action is his demotion in January 1993 from his position of Location Manager to airport Station Manager, and his replacement by a white male.

 Budget first argues that this reassignment of positions did not constitute an *adverse* employment action because Booker did not suffer a decreased salary, retained all his former benefits, and in his new position he actually managed *more* people than he did as a Location Manager. As recently expressed by the Sixth Circuit, "[t]o constitute an adverse employment action, an act must result in a loss of pay or benefits, a detrimental change in responsibilities, a negative change in the terms or conditions of employment, or some actual and unfavorable change in job status." *Birone v. Indian River Sch.,* No. 97–3212, 1998 WL 199791, at \*4 (6th Cir. April 15, 1998) (citing *Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 876, 885 (6th Cir.1996); *Smart v. Ball State University,* 89 F.3d 437, 440–42 (7th Cir.1996)). This definition is nearly identical to the Supreme Court's definition in *Burlington* of a tangible employment action. As discussed above, it is evident that Booker suffered a tangible employment action, and by extension, an adverse employment action, when he was demoted by Grundman.

 Having determined that the demotion to the airport Station Manager position was an adverse employment action, the Court must now decide whether any direct evidence of discrimination exists such that Booker can rely on the direct evidence proof structure. The term direct evidence refers to testimony that establishes discriminatory animus without the benefit of inferences. *Bartlik v. U.S. Dep't of Labor,* 73 F.3d 100, 103 (6th Cir.1996). In other words, direct evidence consists of any evidence that would, standing on its own, be sufficient to prove discriminatory intent. *Compare Terbovitz v. Fiscal Court of Adair County, Ky.,* 825 F.2d 111, 114 (6th Cir.1987) (testimony from witnesses that the county would not hire a female for an employment position is direct testimony) [*and* ] *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1249–50 (6th Cir.1995) (affidavits alleging that racist comments were made can constitute direct evi-

dence) *with Betkerur v. Aultman Hospital Assoc.,* 78 F.3d 1079, 1096 (6th Cir.1996) (ambiguous remark does not constitute direct evidence) [*and* ] *Gagne v. Northwestern Nat'l Ins. Co.,* 881 F.2d 309, 314 (6th Cir.1989) (Isolated and ambiguous statements made by supervisors which are abstract, irrelevant, and prejudicial, are not direct evidence.).

 Booker argues that Grundman's use of the racial epithets "nigger" and "whipping boy" are evidence of direct discrimination. Isolated use of racially derogatory terms does not in and of itself constitute direct discrimination. *See LaPointe v. United Autoworkers Local 600,* 8 F.3d 376, 380 (6th Cir.1993) (quoting *Gagne,* 881 F.2d at 314). However, the use of racial slurs may constitute direct evidence if it is routine, *Talley,* 61 F.3d at 1249 & n. 2; involves a person with the capacity to make employment decisions, *Hull v. Cuyahoga Valley Bd. of Educ.,* 926 F.2d 505, 514 (6th Cir.1991); or if, in conjunction with other evidence, establishes a nexus between the employment action and discriminatory conduct, *see id.* at 514–515, *Hysten v. Jefferson County Bd. of County Comm'rs,* 995 F.Supp. 1191, 1198–99 (D. Kan.1998). In the present case, the person to which these racial epithets are imputed is the one who was in an immediate supervisory position over Booker, and who made the decision to demote him. Accordingly, if the jury believes that these statements were made, Booker would have succeeded in establishing that race played a motivating factor in the decision to demote him. Even if the Defendants could establish that they would have made the same decision regardless of any discriminatory motive, they would still be held liable, even if monetary relief may be precluded. Whether the Defendants have proved their affirmative defense and are entitled to a limitation of remedies is an issue that the Court need not presently address, as it has concluded that Plaintiff has sufficiently asserted a question for the jury on the issue of liability.

### 2. *Failure to Promote in March 1993*

 Booker further claims that the failure to reinstate him (promote him) to his former position of Location Manager after

Bearden resigned in April of 1993 was discriminatory. With respect to this claim, the Court finds that Booker has not adequately set forth direct evidence to suceed on this claim. The allegations that Grundman used racial epithets against African–Americans does not suffice in Booker's failure to promote claim because, as Booker himself admits, Grundman did not make the decision as to who to promote to that position. (Pl's Resp. to Am. Statement of Facts ¶ 39.) Rather, the candidates were interviewed and ultimately selected by Jeff Elberling, to whom the Location Manager would eventually report. (Mem. Supp. Def's Mot. Summ. Judgt. at 25 n. 38.) Accordingly, Booker's failure to promote claim will be analyzed under the *McDonnell Douglas* burden-shifting framework.

As discussed above, the *McDonnell Douglas* approach requires Booker to first prove a *prima facie* case of discrimination by establishing that he is a member of a protected class, was qualified for the position, was not hired, and that the position was filled by someone who was not African American. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. It is undisputed that all of these elements have been demonstrated by Booker.

The Defendants contend, however, that they had legitimate business justifications for denying Booker the promotion. They assert that due to Grundman's concerns about Booker's performance as a Location Manager, Budget had reservations about returning Booker to that position. Further, the Defendants point out that Barbara Barrett was highly qualified for the position of Location Manager. She had been employed with Budget for ten years, and had worked with a rival rental car company, Hertz for several years prior to this. Barrett had extensive supervisory experience at Budget, holding positions as Training Manager, Airport Training Manager, Customer Service Representative Supervisor, Truck Supervisor, Airport Manager, and Revenue Manager. (Pl's Resp. Am. Statement of Fact ¶ 39.) The Court finds these reasons to be sufficient to establish a legitimate justification for Budget's decision not to promote Booker.

As such, Booker has the final burden of proving that Budget's stated reasons for failing to promote him were pretextual, and that Budget was actually motivated by race. The Plaintiff has failed to set forth any evidence, aside from actions which he attributes to Grundman, and his solitary belief that he was more qualified than Barrett, to establish pretext. As previously discussed, any discriminatory motive on the part of Grundman is irrelevant in the failure to promote claim, because Grundman did not participate in this employment decision. Furthermore, Plaintiff's opinion that he was more qualified than Barrett is not sufficient to prove pretext— reasonable minds could differ as to the respective qualifications of Booker and Barrett. Consequently, Booker's discrimination claim for failure to promote must be dismissed.

## C. Retaliation

Title VII's anti-retaliation provision provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made unlawful by [42 U.S.C. § 2000e], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). A retaliation claim, like a disparate treatment case, can be proved through either the direct evidence or *McDonnell Douglas* approach. *See Christopher v. Stouder Mem. Hosp.*, 936 F.2d 870, 879 (6th Cir.1991) (considering a retaliation claim under both the direct evidence and McDonnell Douglas frameworks). The elements required for proving a *prima facie* case in a retaliation case, however, are somewhat modified, and require a plaintiff to show that "(1) he was engaged in activity protected under Title VII; (2) he was the subject of an adverse employment action; and (3) a causal link between the protected activity and the adverse employment action existed." *Johnson v. U.S. Department of Health & Human Servs.*, 30 F.3d 45, 47 (6th Cir.1994). The remaining burden shifting elements under the *McDonnell Douglas* approach remain the same. Consequently, once the *prima facie* claim of retaliation is made out by the plain-

tiff, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089. If the defendant carries this burden, the plaintiff must then produce "sufficient evidence to allow a jury to reasonably reject [the employer's] explanation" as a pretext for discrimination. *Id.* Despite the shifting burdens of production, the burden of persuasion remains at all times with the plaintiff. *Id.* at 256, 101 S.Ct. 1089.

■ Booker claims that Budget retaliated against him for filing an EEOC charge of discrimination on February 8, 1993 in three instances, first by giving him a negative performance evaluation around September of 1993, then by failing to advise him that the Airport Manager Position was open in September of 1993, and finally, by giving him a written warning in November of 1993. The Defendants maintain that Booker cannot prove a causal connection between these actions and a retaliatory motive.

■ The Plaintiff has failed to provide any direct evidence of retaliatory motive with respect to any of his claims of retaliation, and accordingly, the *McDonnell Douglas* evidentiary framework will be applied to each of these claims. Considering first the negative performance evaluation which was given to Booker by David Ritz, the Court concludes that Booker has has not proven his *prima facie* element that this was a negative employment action. Although the Sixth Circuit has not squarely addressed this issue, most courts have concluded that negative performance evaluations cannot standing alone constitute an adverse employment action. However, negative evaluations can be used as evidence of an adverse employment action, particularly when they contribute to an employee's demotion, disadvantageous transfer of positions, or failure to promote. *Montandon v. Farmland Indus., Inc.,* 116 F.3d 355, 359 (8th Cir.1997); *accord Smart v. Ball State University,* 89 F.3d 437, 442 (7th Cir. 1996); *but see Hoeppner v. Crotched Mountain Rehabilitation Center, Inc.,* 31 F.3d 9, 13, 15 (1st Cir.1994) (listing unwarranted negative job evaluations as adverse employment actions). Here, the evaluation given to

Booker by Ritz, assuming that it was a negative evaluation, cannot constitute an adverse employment action because it was not used as a factor in lowering Booker's pay, decreasing his benefits, or to otherwise adversely affect his job status. *See Birone,* 1998 WL 199791, at *4. To the contrary, Booker was in fact given a pay raise retroactive to April 7, 1993 shortly after this evaluation was added to Booker's personnel file. (Pl's Resp. Am. Statement Facts ¶ 44.) Although Budget's refusal to permit Booker to apply for the Airport Manager position (a negative employment action) and the issuance of the negative employment evaluation appear to have occurred at approximately the same time, it is unclear from the record whether this evaluation could have influenced the appraisal of Booker's qualifications to be Airport Manager. Booker has given contradicting testimony as to whether the evaluation was issued before or after the position of Airport Manager was posted. Booker's EEOC charge indicates that the performance evaluation was made on September 15, 1993, and that the new Airport Manager, Scott Darr, began his employment on October 4, 1998. However, in his Affidavit, Booker indicates that the performance evaluation was actually made in October of 1993, which would have been after the Airport Manager was selected. (Booker Aff. 12.) This conflicting testimony is insufficient to show a causal connection between the negative performance evaluation and an adverse employment action. Similarly, Booker has failed to produce any evidence that the written warning issued to Booker by Scott Darr in November of 1993 was used to justify any kind of material change in his job status. Accordingly, both of these retaliation claims must be dismissed.

■ As to the claim that Budget's refusal to permit Booker to apply to the Airport Manager position once it became available in September of 1993 was retaliatory, the Court will first address why this claim should be analyzed under the *McDonnell Douglas* framework rather than under the direct evidence method of proof. Booker has alleged that when he spoke with David Ritz about the fact that he had not been invited to apply

to the Airport Manager position, Ritz responded that no one in Nashville was qualified for the position, and mentioned that Booker had a "legal thing pending." (Booker Aff. ¶ 14.) When questioned about this comment in his deposition, Ritz stated that he did not recall making it, but that if he had mentioned Booker's filing of an EEOC charge, it would have been in the context of advising Booker to put the past behind him and to move forward. (Ritz Dep. at 35.) However, Ritz was involved in the decision to fill the vacancy with someone from outside of Nashville. (*See* Ritz Dep. at 33.) Given the fact that the meaning of this comment is ambiguous, and that it was not made by the person with final authority over the decision regarding who to hire as Airport Manager, the Court concludes that this statement does not provide direct evidence of retaliatory intent.

Thus, the *McDonnell Douglas* framework must also be applied to this claim. Applying the *prima facie* factors, the Court determines that Booker has proved that he is a member of a protected group, and that he suffered from an adverse employment action—i.e ., he was denied a promotion. The Court further concludes that Booker has submitted prima facie evidence that there was a causal link between the adverse employment action and a retaliatory motive—namely, Ritz' comment that he had a "legal thing pending." Though this comment is not sufficient to establish direct evidence of wrongful intent, it is sufficient to raise an inference of retaliation.

The next step is to determine whether the Defendants have articulated a legitimate business rationale for not giving Booker the opportunity to apply for the Airport Manager position. First, Budget points out that Booker was not the only manager prevented from applying to be Airport Manager. A decision was made by managers in the regional level, the level of authority *above* Ritz, that none of the Nashville managers were qualified for the position. (Ritz Dep. at 33.) All of the Nashville managers were equally affected by this decision. In fact, Barbara Barrett, a white woman, was the only manager in Nashville who had ever filled the Airport Manager

position, and even she, who might have been the most logical choice to fill the position, was not asked to apply. Moreover, Defendants point out that the person who was selected to fill this position, Scott Darr, had extensive experience managing airport locations. (Mem. Supp. Def's Mot. Summ. Judgt. at 29.) These business justifications suffice to meet Budget's burden of producing a legitimate reason for the adverse employment decision against Booker.

The Plaintiff can thus not prevail on his claim of retaliation unless he can show that Budget's stated reasons for not informing Booker of the Airport Manager opening are pretextual. In this regard, the same evidence which aids in building the *prima facie* case may also be considered at the pretext stage. *Trentham v. K–Mart Corp.,* 806 F.Supp. 692 (E.D.Tenn.), *aff'd,* 952 F.2d 403, 1992 WL 3716 (6th Cir.1992). However, Booker is still required to actively convince the factfinder that discrimination was a factor in the employment decision, and cannot meet this burden by simply showing that the Defendant's stated reasons should not be believed. Booker's asserted proof of pretext includes only Ritz' statement that Booker had a "legal thing pending," and the fact that Budget management were aware of his filing of an EEOC charge at the time the Airport Manager position became available. Even taken in its most favorable light, this evidence is not sufficient to prove pretext. Assuming that Ritz intended his statement to mean that Booker was prevented from applying to be Airport Manager in retaliation for his EEOC complaint, Ritz' beliefs could not have caused the adverse employment action because Ritz did not make the final decision to exclude all Nashville managers from applying for this position. (*See* Ritz Dep. at 33.) Moreover, the fact that all Nashville managers were prevented from applying for this position is convincing proof that Booker was not singled out because he accused Budget of racial discrimination. Thus, the Court concludes that a reasonable jury could not find that Booker was retaliated against for filing his EEOC charge by foreclosing his opportunity to become Airport Manager. This claim will thus be dismissed.

## D. *Pay Discrimination*

In the section of his Complaint which explains the factual predicate for his claims, Plaintiff asserts that he "learned that in spite of his seniority and experience as a manager, he was the lowest paid of all the managers." (Compl.¶ 6.) However, the Plaintiff fails to assert wage discrimination in the section of the Complaint which lists the asserted "causes of action." Although the Plaintiff has not explicitly asserted a cause of action for wage discrimination, the Defendants seek summary judgment on any possible wage discrimination claims. They assert that this claim is improperly raised because it was not included in the EEOC charge, and that the claim lacks merit because Booker was the highest-paid station manager. In the briefs submitted to the Court, Booker has not asserted any basis by which the Court could permit a wage discrimination claim to go forth against the Defendants. Accordingly, to the extent that Booker has alleged a wage discrimination claim, this claim should be dismissed because Booker has failed to state any basis to prove that a disputed issue of material fact exists with respect to this claim, as is required to defeat a motion for summary judgment. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that the Plaintiff's claims of discrimination for failure to promote him to Location Manager in 1993, and his retaliation and wage discrimination should be dismissed, but that the Plaintiff may go forth with his claims of racial harassment and racial discrimination with respect to the decision to demote him from the position of Location Manager to Station Manager. The Defendants' Motion for Summary Judgment is thus granted in part and denied in part.

An appropriate Order will be issued forthwith.

### *ORDER*

Pending before the Court is the Defendants' Motion for Summary Judgment (Doc. No. 40), to which the Plaintiff has Responded (Doc. No. 59), and the Defendants have filed a Reply. (Doc. No. 66.) For the reasons expressed in the accompanying Memorandum, this motion is GRANTED in part and DENIED in part. The Plaintiff's Motion for a Status Conference is also DENIED as moot. (Doc. No. 104.)

The Court concludes that the Plaintiff's claims of discrimination for failure to promote him to Location Manager in 1993, and his retaliation and wage discrimination should be dismissed, but that the Plaintiff may go forth with his claims of racial harassment and racial discrimination with respect to the decision to demote him from the position of Location Manager to Station Manager.

It is so ORDERED.