Charles Franklin KING, Sr., individually, and as next friend of his minor sons, Charles Franklin King, Jr., and Davon Edward King; Belinda King; Charles Franklin King, Jr.; Davon Edward King; Martez King, Plaintiffs–Appellants,

v.

CITY OF EASTPOINTE, et al., Defendants–Appellees.

No. 01–2303.

United States Court of Appeals, Sixth Circuit.

Dec. 4, 2003.

Charles H. Chomet, Kelman, Loria, Will, Harvey, & Thompson, Detroit, MI, for Plaintiff–Appellant.

Gail P. Massad, Cummings, McClorey, Davis & Acho, Livonia, MI, for Defendant–Appellee.

* The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Before: MOORE and ROGERS, Circuit Judges; and HOOD, District Judge.*

## OPINION

ROGERS, Circuit Judge.

Plaintiffs, Charles Franklin King, Sr. ("King, Sr."), Belinda King, Charles Franklin King, Jr. ("Charlie"), Davon Edward King ("Davon"), and Martez King ("Martez"), appeal from the district court's order granting summary judgment to the City of Eastpointe and defendant police officers (the "City") on their claims brought pursuant to 42 U.S.C. §§ 1981 and 1983. These claims arise out of four incidents of alleged police misconduct. The district court concluded that there was no evidence of racial discrimination or of a specific practice or policy targeting African–Americans upon which the officers acted, nor was there evidence of unreasonable searches or seizures, and therefore the plaintiffs' claims must fail as a matter of law. For the reasons set forth below, the judgment of the district court is affirmed in part and reversed in part.

## I. BACKGROUND

### A. April 4, 1996 Incident

The first incident involved a police stop of two youths in a parking lot on April 4, 1996. Plaintiffs Charlie and Davon, ages 14 and 13 years old, respectively, had a half-day of school. After they returned home from school, they rode their bikes to the corner of Eight Mile and Gratiot where several businesses are located, including Burger King and Arby's fast food restaurants. Burger King and Arby's are located at opposite ends of what has been described as a "massive" parking lot. According to Police Officer Neil Childs

("Childs"), this parking lot is a high crime area known for thefts, breaking and entering of automobiles, crimes against persons, and other criminal activity. J.A. at 185, 853.[1]

Charlie and Davon first went to the Burger King, and Davon went inside while Charlie waited outside with the bikes. Davon exited the Burger King a few minutes later, ostensibly because the lines for food were too long. The two brothers then biked over to Arby's. At approximately 12:55 p.m., Childs was in his patrol car in the large parking lot, and he first observed Charlie and Davon as they rode their bikes toward Arby's. J.A. at 184–85. When Charlie and Davon arrived at Arby's, Davon again went inside while Charlie waited outside with their bikes. Once Davon was inside he realized that the money he thought he had brought to buy lunch was not in his pocket, so he immediately left the Arby's to tell Charlie about the missing money. Charlie and Davon decided to retrace their steps to see if they could find the money, and rode back towards the Burger King at a "jogging speed." J.A. at 814.

There is some dispute about what occurred when Charlie and Davon returned to the Burger King. They stated that they simply biked up to the entrance of the Burger King to look for Davon's money, but that they did not dismount from their bikes. J.A. at 815. Officer Childs, on the other hand, said that when Charlie and Davon returned to Burger King they repeated the same procedure that they had at Arby's: Davon went inside and then returned shortly without any food, while Charlie stayed outside with the bikes. J.A. at 185, 849. In his deposition, Childs stated that Davon actually went in and out of both the Burger King and the Arby's twice, returning without food each time he left the restaurants. J.A. at 849.

The brothers left the Burger King and proceeded back along the route they had come to look for Davon's money. Both brothers stated that they were moving at the same slow "jogging speed" with which they biked from the Arby's to the Burger King. J.A. at 815, 860. Alternatively, Officer Childs stated that at this point the brothers looked back at him in the police car and then sped off quickly down an alleyway. J.A. at 185, 850. Officer Childs

---

1. The plaintiffs contend that the court should not consider this fact because Childs did not mention it in his deposition, but only alleged it in a later affidavit. They further emphasize that Childs stated in his deposition that the only basis he had for reasonable suspicion was truancy. In support of this argument plaintiffs cite *Reid v. Sears, Roebuck & Co.,* 790 F.2d 453 (6th Cir.1986), for the proposition that a party cannot file an affidavit that contradicts earlier deposition testimony. *Id.* at 460. This argument fails for two reasons. First, Childs's affidavit does not contradict his deposition testimony. Childs does mention that the parking lot is a high crime area in his deposition, although perhaps not in as explicit terms as he does in his affidavit. *See* J.A. at 853. If anything, Childs merely makes clearer a point that was left undeveloped in his deposition. Plaintiffs also overemphasize Childs's statement that the only cause he had for suspicion was truancy, considering that in virtually the same breath he states his concerns based on the behavior of the King brothers, as well as the high criminal activity found in that area. Second, plaintiffs misunderstand the purpose of the rule in *Reid*. *Reid* states that a "party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." 790 F.2d at 460. The purpose of this rule is to bar the *non-moving* party in a summary judgment proceeding from creating an issue of fact merely by making contrary statements in an affidavit, and does not apply to an affidavit filed by the *moving* party. In any event, the affidavit in this case does not contradict the earlier deposition testimony, and therefore the plaintiffs' argument is without merit.

thought Charlie's and Davon's behavior was suspicious, and also suspected that they might be truant from school. J.A. at 185, 850–53. Officer Childs then initiated a field investigation.

Officer Childs began by asking the brothers for their names and identification. Charlie and Davon both asserted that Officer Childs also asked them why they weren't in school. J.A. at 818, 861. The brothers stated that they provided Officer Childs with their names and explained that their school did not provide identification cards. J.A. at 818, 861–62. They both also alleged that Charlie explained to the officer that they only had a half-day of school. J.A. at 818, 862. Furthermore, in his deposition Charlie stated that Officer Childs told him that Childs had stopped them because he had received a call saying that "two black males had came [sic] over and stole bikes." J.A. at 861.

As for the remainder of the incident, the brothers' version is as follows. Davon told Officer Childs that they had gone to the Burger King and Arby's to buy food. According to Charlie, Davon also told the officer that he was looking for money because he thought he had lost his on the way to the restaurants, J.A. at 861, although Davon did not recall telling the officer that he lost his money. J.A. at 821. After asking these questions, Officer Childs conducted a pat-down search of Charlie, which Charlie described as follows:

> He patted me down on my chest. Then he went down to my stomach. Then he went down to my pants. Then he went in my pants.
>
> He grabbed my private part. And then he came on my private part. Then he grabbed my underwear where my private part was at. Then he pulled my underwear from the back up. Then he came out my pants.

> Then he went in my pocket, grabbed my keys, took them out and started playing with them. Then he put them back.

J.A. at 862. Charlie further stated that he did not receive any injuries from this search. J.A. at 863. Davon's account of the search also describes the officer playing with Charlie's keys and pulling up the back of his pants, but does not mention the officer grabbing Charlie's "private part." J.A. at 862. After the frisk, Officer Childs placed Charlie in the backseat of the police car.

Officer Childs then turned his attention towards Davon. Davon asked Officer Childs where he was taking Charlie, to which Officer Childs responded "do you see him in handcuffs, boy?". J.A. at 819. After this exchange Officer Childs radioed for assistance, and shortly thereafter Sergeant Clements arrived on the scene. Sergeant Clements first spoke to Davon, explaining to him that Officer Childs had stopped them because they had a report that two black males were stealing bikes. Sergeant Clements then spoke to Charlie, asking him his name and why they weren't in school, and Charlie gave his name and explained about the half-day of school. Meanwhile, Officer Childs spoke further with Davon. After Charlie provided his name and an explanation about school, Sergeant Clements let Charlie out of the backseat of the police car, told the brothers that he would call their parents, and informed them that they were free to go. Neither Officer Childs nor Sergeant Clements called the school to determine if there was a half-day of school during their investigation. Additionally, neither of the brothers has any recollection of the length of the stop, nor of the amount of time Charlie was in the backseat of the police car.

Officer Childs description of what occurred contains some significant differences. According to Childs, when he asked the brothers for their names Charlie responded with "I'm not giving you nothing because I haven't done anything wrong." J.A. at 186, 852. Childs then addressed the question to Davon King, who responded with his name and also informed Childs that he was "buying some food." *Id.* Childs then asked Davon if he had any money for the food, and Davon answered in the negative, but said that he was "looking for money." *Id.* At this point Charlie told his younger brother to "shut up." J.A. at 186. Charlie continued to be uncooperative with Officer Childs and repeatedly told his younger brother to "shut up" or "be quiet." J.A. at 853. Davon was being somewhat cooperative with Childs, but due to Charlie's influence Officer Childs had difficulty talking with Davon, so Officer Childs decided to separate the two brothers to see if he could find out what was going on from Davon. Officer Childs conducted a frisk of Charlie before placing him in the back of the police car, telling Charlie "to have a seat ... while I talk[ ] to [your] younger brother." J.A. at 853. This frisk was a brief search for weapons and was conducted for officer safety purposes. Officer Childs recalled that he "grabbed his pants" and "gathered up his pants into my hand so that I could check his waist." J.A. at 855.

Following the search, Childs called for a supervisor because of the brothers' uncooperative nature. Shortly thereafter Sergeant Clements arrived, and Officer Childs briefly explained the situation. Sergeant Clements then went and spoke to Charlie, while Childs spoke further with Davon. Charlie remained uncooperative, but after Sergeant Clements explained to Charlie that he would be allowed to leave once he provided them with some information, Charlie told the officer his name and address. Officer Childs was also able to obtain Davon's name and address. Sergeant Clements told Charlie that he was free to leave, and Officer Childs likewise informed Davon that he could depart. Charlie was detained in the police car for approximately three minutes. J.A. at 186, 189, 191. According to Childs, he was never able to ask about whether the brothers should have been in school due to their uncooperative nature, and once Sergeant Clements decided to let the brothers go, Childs simply followed his superior officer's lead. Childs did not call the school upon his return to the station later that day.

Plaintiffs allege that two other incidents, not directly at issue in this appeal, are pertinent to the April 4, 1996, incident because they show a practice or policy on which municipal liability can be based, or ratification sufficient for supervisory liability. The first of these incidents took place sometime before June 30, 1995, while the second occurred on that date. In both of these incidents Charlie and Davon were riding their bikes in the neighborhood near their home when they were briefly stopped by Eastpointe police officers. The police officers informed Charlie and Davon that they had received some reports that two young black males were coming over from Detroit and stealing bikes in that neighborhood. After the King brothers answered the officers' questions, the police officers let the brothers leave. Both incidents lasted approximately ten to fifteen minutes.

On February 11, 1996, the brothers' father, Charlie Franklin King, Sr., sent a letter complaining about the June 30, 1995 encounter. F.E. DeWeese, Chief of Police for the City of Eastpointe, met with King, Sr., about his concerns with this incident. DeWeese then drafted a memorandum describing his meeting with King, Sr., and discussing the circumstances underlying

the June 30, 1995, incident. He explained the background to the June 30, 1995 incident as follows:

> From May of 1995 to August of 95 several complaints of strong-arm robbery and larceny of bicycles were made to this Department by citizens of the City. Most of these crimes took place in the south end of the city. All of the crimes listed suspects as younger black males, (see attached reports). During that time, I was assigned as a Shift Commander on the Afternoon Shift. The majority of these crimes took place in the early afternoon. My instructions to the officers were to investigate any black youths riding through our subdivisions. During this time, Mr. King's sons were stopped.

J.A. at 714–15. This memorandum was sent to the City Manager as part of the internal investigation process and never circulated within the Police Department. As noted in the text, DeWeese was a Shift Commander during the time period of May 1995 to August 1995, and did not become Chief of Police until January of 1996. The Chief of Police is responsible for setting policy for the Eastpointe Police Department.

Officer Childs was not hired by the Eastpointe Police Department until July 5, 1995. He then attended the Macomb County Police Academy and did not begin performing police duties until December of 1995. Childs was not a member of DeWeese's afternoon shift in the summer of 1995, and had no knowledge of DeWeese's memorandum to the City Manager.

## B. September 30, 1996 Incident

The second incident relied upon by the plaintiffs involved the detention of Charlie by the police for less than a two hour period as part of a police investigation into a reported assault. On September 30, 1996, a young African–American man named Terrence Strong, a friend and schoolmate of Charlie, was involved in an altercation with James Markham when Strong was walking with some friends from East Detroit High School to a restaurant called "Da Pizza Joint." During this incident Strong and another young African–American male threatened Markham and implied that they had a knife. Markham drove to the Eastpointe Police Station following the incident and filed a report. In describing his two assailants, Markham identified the first as a teenage black male wearing a reddish-orange flannel shirt and a yellow pick in his hair, while the second was also a teenage black male who might have been wearing a tan colored shirt. This information was transmitted over the police radio, and in this report the second suspect was described as wearing a tan-colored shirt or jacket.

After the altercation with Markham, Strong and his friends went into Da Pizza Joint. Strong ordered pizza, and then he sat next to the east wall of the restaurant with one of his friends. According to Strong, this friend was Charles, a teenage African–American male. J.A. at 978–79. Charlie, on the other hand, stated that the friend was Tyrone Taylor, a teenage male that Strong described as "biracial" and "light-skinned." J.A. at 974, 981, 995. Shortly thereafter Charlie entered Da Pizza Joint and spoke for a short while with Strong and his friend.[2] J.A. at 978, 995. Charlie then went and sat at a table on the west side of the restaurant with several of his friends, including at least one other

---

**2.** Charlie's testimony on this point is somewhat confusing. He states that he did "talk" with Strong, but that Strong did not "join" him. J.A. at 994–95. Strong testified that Charlie stood and talked with the seated Strong before going to the other side of the room. J.A. at 978–79.

teenage African–American male. J.A. at 994–95.

Several police officers responded to the report of the Markham assault given over the police radio. They originally checked at a nearby Seven–Eleven, as Markham had stated that his assailants were headed in that direction, but could not locate the suspects. Officer Margita began looking in other nearby businesses, and observed two African–American teenage males standing near the east inside wall of Da Pizza Joint. J.A. at 984. One of the two teenagers was wearing an orange flannel shirt and had a yellow comb in his hair. J.A. at 266, 984. Officer Margita then radioed the other officers that he had located a suspect that matched the description in the report.[3] J.A. at 266. Several other police officers joined Officer Margita, and they went inside the restaurant to investigate the two youths that Margita had observed. According to Charlie, he was sitting on the far side of the restaurant from Strong when the police officers entered the restaurant. J.A. at 996. The police officers told him to go sit next to Strong and told Tyrone Taylor, who was sitting next to Strong, to move to the other side of the restaurant. *Id.*

Officer Margita approached Strong and patted him down, while another officer approached Charlie and patted him down as well. According to Officer Hill, one of the police officers who responded to Officer Margita's radio message, Charlie was wearing a black jacket and black shirt with tan pants. J.A. at 1001. Some police reports also state that Strong and Charlie were the only two teenage African–American males in the restaurant. J.A. at 983, 1001, 1006. The officers conferred and decided that probable cause existed for further detention and investigation. Charlie and Strong were transported to the

Eastpointe Police Station, where Charlie was fingerprinted and photographed. During this process Charlie overheard someone state "We got those niggers." J.A. at 997. While Officer Margita was booking Strong, Strong informed him that Charlie was not involved in the incident. Officer Hill had also just discovered from Markham that Charlie was not involved. Charlie was released immediately after this information became known. According to the police, Charlie was detained at the police station for approximately 20 minutes, while Charlie stated that he was detained for an hour and forty-five minutes, although it is unclear what is included in this time frame. J.A. at 267, 271, 996–97.

### C. February 28, 1997 Incident

The third incident relied upon by the plaintiffs involved an allegedly unconstitutional car stop. On February 28, 1997, at 9:12 in the evening, the Eastpointe Police Department received an anonymous 911 call from the pay phone outside of Eastland Liquor Store. The caller reported that "three black males" were dealing drugs to "four or five white girls" in the alley next to the Eastland Liquor Store. J.A. at 405. Officers Keiser and Ostrowski were dispatched to investigate.

Martez, Charlie, and Martez's friend Emanuel Cherry had driven to Eastland Liquor Store to buy snacks and play the lottery. When they arrived, there were approximately three white girls standing outside the liquor store, several of whom Charlie knew from school, and one with whom Martez was acquainted. J.A. at 897, 922. Martez spoke briefly with his acquaintance and then went into the store with Emanuel, while Charlie stayed outside for a short time and talked with his

---

**3.** Officer Hill stated that Officer Margita radioed stating that he had identified *two* suspects

inside "Da Pizza Joint" that matched the description of the assailants. J.A. at 271.

friends. J.A. at 897–98, 922. Charlie later joined Martez and Emanuel in the store, and the three of them left the store together.

When they left the store they noticed a police car on the corner. J.A. at 900. They entered their car and Martez told the others to put on their seatbelts, an instruction with which they allegedly all complied. J.A. at 900–01. Martez then turned out of the parking lot onto Eight Mile, and the police car pulled out and followed him. J.A. at 901. Martez proceeded down Eight Mile at "the regular speed on Eight Mile, which is like twenty miles per hour," and then turned onto a side street and traveled at "about five miles per hour." J.A. at 416. The posted speed limit on Eight Mile is forty miles per hour, and on the side street it is twenty-five miles per hour. J.A. at 918.

Officer Keiser was driving the police car that followed Martez, Emanuel, and Charlie onto Eight Mile. In his report, Officer Keiser stated that when he arrived at Eastland Liquor he observed three black males in a 1988 Chevrolet pull away from curb and start down Eight Mile. J.A. at 409. As the vehicle passed in front of him, Keiser saw that the occupants of the car were staring at him. Id. Keiser immediately followed the Chevrolet down Eight Mile as he believed that the occupants were those that he was sent to investigate. J.A. at 917. He performed a LEIN [Law Enforcement Information Network] check on the vehicle's license plate, which revealed that the car's owner was registered at 2110 Outer Drive, Detroit.

Meanwhile, Officer Ostrowski proceeded to the Eastland Liquor Store. J.A. at 414. He did not see anybody in the alley or in front of the store, but went in and spoke with the store clerk, who stated that there had not been a problem either inside or outside the store. Id. Ostrowski radioed in this information and then left the liquor store. Id. He was told that Keiser was going to perform a stop of the Chevrolet and was instructed to provide assistance.

When Martez pulled onto the side street, Officer Keiser became concerned that he had turned into the subdivision "to find a suitable place to run from the vehicle or throw drugs from the vehicle."[4] J.A. at 409. Keiser radioed for assistance and continued to follow the vehicle at the distance of about fifteen feet. After only a few blocks Martez turned onto Collinson, the street on which the King family resided.

At this point Officer Keiser turned on his brights and allegedly noticed that the front windshield of the vehicle was cracked, that there was an ornament hanging from the rearview mirror more than four inches from the top of the windshield, and that both front seat occupants were not wearing their seatbelts. J.A. at 409, 919. The crack in the windshield was approximately an inch or two above the dashboard and at least one foot in length. J.A. at 1102. After having made these observations, Officer Keiser turned on his lights to perform a stop. Officer Keiser stated that he turned on his flashers at the intersection of Collinson and Boulder, and that Martez continued to drive for approximately 1500 feet and pull in to the driveway at 16115 Collinson. J.A. at 409–10. Martez, on the other hand, stated that the police car did not turn on its flashers until he turned on his signal to turn into the King's driveway, which he did at the house previous to the King's. J.A. at 903.

Officer Keiser went to driver's door of the Chevrolet and asked Martez for his

4. According to Officer Keiser, his reasoning behind this concern was that Eight Mile is a long open road where it would be difficult to run or hide, whereas a side street is darker and narrower with houses and bushes to provide cover. J.A. at 918.

license, registration, and proof of insurance. By this time Officer Ostrowski had also arrived, and he set up in a back-up position at the right rear of the Chevrolet. Ostrowski noticed that King, Sr., had come out of the house and was approaching Officer Keiser, so he asked King, Sr., to return to the front porch of his home. King, Sr., was visibly upset, and began demanding an explanation. Officer Ostrowski told him that they were performing an investigation and that they would give him an explanation upon its completion. Following this exchange, Ostrowski spoke to Charlie and Emanuel and asked them for their identification, and then moved to the driver's side rear of the car.

While these events were taking place three more police officers arrived, including Corporal Borowsky. Borowsky spoke with King, Sr., about the incident, and Martez overheard him tell King, Sr., that they were performing this investigation because they had received a report of someone dealing drugs in front of the liquor store. J.A. at 415, 904. Officer Keiser determined that he did not have probable cause to search the vehicle as there was no contraband in plain view, and thought it unlikely that he would receive consent to search considering the "increasingly hostile actions and past contact with the King family." J.A. at 410. He issued citations to Martez for a cracked windshield, visual obstruction, and failure to wear a seatbelt, and then he and the other officers left the scene. The entire incident lasted approximately ten minutes. The police did not do any follow up to the incident at Eastland Liquor Store other than that already done by Officer Ostrowski, nor did they ever speak to the white girls about the incident. J.A. at 927, 930.

### D. March 6, 1997 Incident

The fourth incident at issue in this case did not involve direct misconduct by the police, but rather harassing actions by private persons who were never identified or apprehended by the police. In the afternoon of March 6, 1997, Davon was walking home from school when two white teenage males drove by in light blue Ford pick-up and yelled out to Davon the phrase "lower east side white nigger." J.A. at 479. Davon responded by sticking up his middle finger in the direction of the pickup. The two white males stopped their truck and confronted Davon, bumping shoulders with him as if to initiate a fight. Charlie saw this confrontation from the window of the King home and ran out to join his brother. One of the two white males then returned to the truck and pulled out something black which appeared to Davon to be a weapon of some kind. Seeing this, Charlie and Davon ran back to their home. A few moments later they returned to the scene of the confrontation with their cousin, Martez. The two white males had returned to their truck and gone up the street a short ways, but upon seeing the Kings return, they circled around and drove straight towards them. At that time a white van driven by a Mrs. Tina Nichols pulled up near the Kings, and the pickup swerved to avoid hitting both the Kings and the white van. The passenger in the pick-up waved a black crowbar at the Kings, and then the pick-up sped off.

The Kings went with their father to the Eastpointe Police Station to file a report about the incident with Officer Lulko. They were able to give a description of both assailants, but did not know either of the assailant's names, nor did they provide the license plate of the vehicle. They did however provide the names of two witnesses, Tina Nichols, the driver of the white van, and her daughter, Krystal Nichols. Officer Lulko contacted the Nichols and asked them to make a written statement. Krystal told the police that she recognized one of the assailants as "Mark," a boy who attends East Detroit High

School. Krystal also informed Officer Lulko that "Mark" lived on Redmond Street, although she was unsure of the exact address. J.A. at 477, 641.

The case was then turned over to Detective Corsi. He attempted to identify "Mark" by looking through the East Detroit High School yearbook but was unable to do so. He did not contact the school to inquire if they had a student named "Mark" who lived on Redmond Street. Corsi also did not ask Krystal for a description of "Mark," did not look through a yearbook or go to East Detroit High School with her to try and identify "Mark," did not ask her to attempt to find out "Mark's" last name, and did not ask her to help them find where "Mark" lived on Redmond Street.[5] Redmond Street is less than a half mile in length. J.A. at 653B. Detective Corsi determined that the suspects in the case were unidentified and closed the case. J.A. at 489, 658.

## II. ANALYSIS

### A. Standard of Review

We review a decision to grant summary judgment de novo. Tinker v. Sears, Roebuck & Co., 127 F.3d 519, 521 (6th Cir. 1997). Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Generally, the burden is on the moving party to show that no genuine issue of material fact exists. Gregg v. Allen–Bradley Co., 801 F.2d 859, 861 (6th Cir.1986). Nevertheless, the moving party does not have to produce evidence showing the absence of a genuine issue of material fact. Instead, "the bur-

den on the moving party may be discharged by 'showing'–that is, pointing out to the [ ] court–that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In summary judgment the facts as well as any inferences that can be drawn from them must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B. General Legal Framework

Plaintiffs allege that, due to the unlawful actions of the City, they have been denied "the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens" in violation of the 14th Amendment and 42 U.S.C. § 1981. To state a claim under Section 1981, the plaintiff must allege that he was treated differently because of his race. See Johnson v. Univ. of Cincinnati, 215 F.3d 561, 572 (6th Cir. 2000); Long v. Ford Motor Co., 496 F.2d 500, 504 (6th Cir.1974); Davey v. Tomlinson, 627 F.Supp. 1458, 1462 (E.D.Mich. 1986). In order to prove his claim, the plaintiff must establish (1) membership in a racial minority, (2) that the defendant(s) intended to discriminate on the basis of race, and (3) discrimination concerning one of the activities enumerated in § 1981. See Brown v. City of Oneonta, 221 F.3d 329, 339 (2nd Cir.2000); Hampton v. Dillard Dep't Stores, Inc., 247 F.3d 1091, 1101 (10th Cir.2001); Morris v. Office Max, Inc., 89 F.3d 411, 413–14 (7th Cir.1996).

Plaintiffs also allege violations of the 14th Amendment and 42 U.S.C. § 1983 due to acts performed by the City against

---

**5.** Defendant's Brief states that "[a]ccording to Tina, officers also drove by the area where she believed Mark lived but they could not locate the suspect or vehicle." There is no verification of this statement in the record.

the plaintiffs because of their race, as well as unreasonable searches and seizures in violation of Fourth Amendment and § 1983. To establish a valid claim under § 1983, a claimant must show (1) that the conduct complained of was committed by a person acting under color of state law, and (2) that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). There is no dispute in this case that the police officers and the City were acting under color of state law. Therefore, this case centers around the latter prong of this test. Plaintiffs' § 1983 claims that are based on racial discrimination receive essentially the same analysis as their claims under § 1981 because they are both based on violations of the Equal Protection Clause of the Fourteenth Amendment, while their § 1983 claims based on violations of the Fourth Amendment are analyzed under the substantive law of that Amendment.

Plaintiffs contend that the individual police officers violated their constitutional rights, that Police Chiefs Fred DeWeese and Thomas Danbert are also liable due to their supervisory role, and that the City of Eastpointe is liable for its policy of racial discrimination. Supervisory liability under § 1983 must be based on more than the right to control employees, and cannot be imposed solely on the basis of *respondeat superior*. *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.1984). Rather, there must be "a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the ·offending subor-

dinate." *Id.* Likewise, a municipality cannot be held liable under § 1983 on the theory of *respondeat superior*. *Monell v. Department of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Instead, a municipality is only responsible "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694. There must be an "affirmative link between the policy and the particular constitutional violation alleged" for a municipality to be held responsible. *Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). The burden of proof is on the plaintiff to set forth the unconstitutional policy and link it with both the municipality and the injuries at issue. *Coogan v. Wixom*, 820 F.2d 170, 176 (6th Cir.1987).

For both the §§ 1981 and 1983 claims the police officers assert the defense of qualified immunity. "A government official who performs discretionary functions is entitled to qualified immunity from civil suits for damages arising out of the performance of his official duties unless his alleged conduct violated clearly established constitutional rights of which a reasonable person would have known." *Christophel v. Kukulinsky*, 61 F.3d 479, 484 (6th Cir. 1995). We have recently set forth the standard for determining when qualified immunity is appropriate:

Qualified immunity involves a three-step inquiry. First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence "to indicate that what the official

allegedly did was objectively unreasonable in light of the clearly established constitutional rights."

*Feathers v. Aey,* 319 F.3d 843, 848 (6th Cir.2003) (*citing Williams v. Mehra,* 186 F.3d 685, 691 (6th Cir.1999) (*en banc* )). If the plaintiffs fail to prove any of these three steps, the police officers are entitled to qualified immunity.

### C. April 4, 1996 Incident

#### 1. § 1983 Racial Discrimination Claim

Plaintiffs assert that the April 4, 1996, investigation of Charlie and Davon by the defendants violated their Fourteenth Amendment right to be free from discrimination on the basis of race. They argue that the investigation of the brothers was the result of an Eastpointe City policy to stop all black youths riding bicycles in the City of Eastpointe. As evidence of this policy the plaintiffs point to the Memorandum written by Chief DeWeese to the City Manager which included the statement "[m]y instructions to the officers were to investigate any black youths riding through our subdivisions." Additionally, they point to two bike stops made in 1995 as evidence of similar incidents where the police also acted in an allegedly discriminatory manner based on these instructions by DeWeese. They further point to the statement allegedly made by Officer Childs during the investigation that Charlie and Davon had been stopped because "two black males had came [sic] over and stole bikes." Pl.Ex. 4, p. 63, J.A. at 861. For each of these claims plaintiffs have not introduced sufficient evidence to withstand summary judgment. Finally, the plaintiffs also assert that Childs's use of the term "boy" in reference to Davon is evidence of discriminatory intent. Because of a factual issue regarding this assertion, summary judgment was not appropriate.

The Equal Protection Clause of the Fourteenth Amendment protects citizens from unreasonable police action that is based on race. *United States v. Avery,* 137 F.3d 343, 352 (6th Cir.1997). To establish a claim of selective enforcement, a plaintiff must establish that the challenged police action "had a discriminatory effect and was motivated by a discriminatory purpose." *Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). A plaintiff can prove discriminatory effect by showing that the police treated similarly situated individuals of another race differently through statistical evidence or identifying a person of another race who police treated differently. *United States v. Armstrong,* 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996); *Chavez v. Ill. State Police,* 251 F.3d 612, 638 (7th Cir.2001). A plaintiff can show discriminatory purpose through evidence that an official chose to prosecute or engage in some other action "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Wayte,* 470 U.S. at 610. A plaintiff must provide proof of intent, although courts may infer discriminatory purpose from the totality of the circumstances. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

With the possible exception of DeWeese's memorandum, plaintiffs' evidence does not sufficiently show selective enforcement based on race. However, the plaintiffs cannot establish that Officer Childs was ever aware of the instructions given by DeWeese to the officers on his afternoon shift, or that Officer Childs was aware of the Memorandum from DeWeese to the City Manager. According to the defendants, Officer Childs was hired during the summer when these instructions were given, but he attended the Macomb County Police Academy until December of that year. He was not a member of DeW-

eese's afternoon shift. Therefore, even assuming that the instructions were discriminatory, there is no evidence of a causal connection between those instructions and the investigatory stop conducted by Officer Childs on April 4, 1996.

The alleged earlier incidents involving similar police stops of Charlie and Davon fail to show discriminatory effect or purpose. The plaintiffs offered no evidence from either incident that individuals of different races received preferential treatment. Moreover, even if the prior incidents showed that the officers involved or the City had discriminatory intent in making those stops, there is no evidence connecting those incidents with Officer Childs's investigatory stop of Charlie and Davon on April 4, 1996.

Officer Childs's alleged statement that he stopped them because "two black males had came [sic] over and stole bikes" also does not show discriminatory intent. The statement itself however reflects that the Kings were not targeted solely because of their race but also because of their number (2) and their mode of transportation (bikes). The statement also has no direct ties to a statement by DeWeese or a policy of the City. In short, the statement does not give sufficient evidence of invidious intent by Officer Childs or the City.

■ Finally, however, Officer Childs's alleged reference to Davon as "boy" may show that Officer Childs's actions following the stop were more burdensome or intrusive than they otherwise would have been because of race. The word "boy" as used by Childs in this context could definitely be interpreted as racially derogatory. There is however little evidence given of the overall context, and it is not clear that the word was meant to be a racially derogatory term. Plaintiffs cite one case, *Booker v. Budget Rent–A–Car Systems,* 17 F.Supp.2d 735 (M.D.Tenn.1988), to support their contention that the term "boy" is racially derogatory. *Booker* held that "whipping boy," in reference to an African–American, was racially derogatory where several other racially derogatory terms were also used. *Id.* at 743. There is no evidence of similar comments made by Officer Childs in this case to demonstrate that "boy" was meant to be racially derogatory. Although it is clear that an African–American could have taken Childs's use of the term "boy" as racially derogatory, it is not clear that Officer Childs meant it that way. Although the question is close, the evidence of the use of a possibly racial epithet raises an issue of fact as to whether Officer Childs's actions toward Charlie and Davon following the stop were based on race.

■ Supervisory liability for Chiefs DeWeese and Danbert does not attach with regard to this claim. The plaintiffs have not introduced any evidence that either DeWeese or Danbert participated in or actively encouraged Officer Childs's investigation on April 4, 1996. *See Bellamy,* 729 F.2d at 421. The only evidence that the plaintiffs have introduced is a memorandum dealing with two bicycle investigations that took place almost a year earlier, and the plaintiffs have not provided any evidence that the instructions in that memorandum were also given to Officer Childs or that Childs was aware of the existence of the memorandum itself. In short, there is no causal connection between this memorandum and the actions of Officer Childs on April 4, 1996.

The same facts also militate against finding municipal liability for Officer Childs's actions of April 4, 1996. As set out above, the policy of the municipality must be the "moving force" behind the alleged constitutional violation. *Monell,* 436 U.S. at 694. Without giving any evidence of a causal connection between the memorandum written by DeWeese and Of-

ficer Childs's actions, the plaintiffs have failed to demonstrate that this policy was the "moving force" behind Childs's investigation.

■ In addition, it is not clear to us that this memorandum gives any evidence of a policy, or that this policy violated the Fourteenth Amendment. Plaintiffs have introduced evidence that the Chief of the Eastpointe Police sets policy for the department. They therefore argue that Chief DeWeese set policy for the police department, and that the February 23, 1996 memorandum is evidence of his discriminatory policy. This argument fails because it is undisputed that, at the time the memorandum was written, DeWeese was not Chief of Police and therefore was not responsible for setting policy for the police department, and plaintiffs have not introduced any evidence that he renewed his instructions once he became Chief of Police.

■ Plaintiffs also assert that Chief DeWeese ratified the discriminatory policy by failing to investigate similar incidents of racially discriminatory bike stops. Failure to act or to make a serious investigation of similar incidents of discrimination can support a claim for municipal liability. See Doe v. Claiborne County, 103 F.3d 495, 508 (6th Cir.1996). However, "[t]he evidence must show that the need to act is so obvious that the [police department's] "conscious" decision not to act can be said to amount to a "policy" of deliberate indifference to [plaintiffs'] constitutional rights." Id. First, it should be noted that DeWeese was not Chief of Police during the time these earlier bike stops occurred, so his action or inaction could not result in ratification of a policy behind those incidents. Second, as stated above, it is not clear that these bike stops were in fact discriminatory. Third, there is evidence that the City did investigate those incidents, as shown by DeWeese's memoran-

dum to the City Manager. The City did not show a "deliberate indifference" to plaintiffs' constitutional rights, it simply determined that plaintiffs' rights were not violated. Id. Whether this determination was correct or not, the actions by the City do not amount to the "deliberate indifference" necessary for municipal liability under a theory of ratification. Id.

■ Defendant police officers assert that they are entitled to qualified immunity with respect to these claims, and the district court agreed. Having held that summary judgment was warranted on the constitutional claims against defendants Clements, DeWeese, and Danbert, we need not reach the question of qualified immunity as to them. Summary judgment for Officer Childs based on qualified immunity, however, was not appropriate. It would not be objectively reasonable for Officer Childs, following the stop, to treat Charlie and Davon differently because of their race, and there is an issue of fact as to whether that occurred.

In short, we find that the plaintiffs have failed to produce any sufficiently colorable evidence to support their claim under § 1983 for racial discrimination, except for the evidence concerning Officer Childs's use of the term "boy." We therefore affirm the judgment of the district court with respect to these claims as to defendants Clements, DeWeese, Danbert, and the City of Eastpointe, and reverse with respect to Officer Childs.

### 2. § 1983 Search and Seizure Claim

Plaintiffs also allege that Officer Childs's investigation on April 4, 1996, was an unreasonable search and seizure in violation of Fourth Amendment. In particular, they contend that Officer Childs lacked reasonable suspicion to conduct an investigatory stop of Charlie and Davon, and even if he did have reasonable suspicion, the detention and investigatory methods used were

unreasonable under the circumstances. Except with respect to Officer Childs's allegedly excessive search of Charlie, summary judgment was appropriate for these claims.

Not all incidents between the police and citizens raise Fourth Amendment concerns. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In this case, both parties concede that a *Terry* stop has occurred; the question raised is the reasonableness of that investigatory stop. When evaluating the reasonableness of an investigatory stop, the Sixth Circuit utilizes a two-prong test. *See United States v. Hardnett*, 804 F.2d 353, 356 (6th Cir.1986). First, the court must evaluate "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to a reasonable suspicion," and second, the court must determine "whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *Id.*

Viewing the facts in the light most favorable to the plaintiffs, we find that Officer Childs had reasonable suspicion to stop Charlie and Davon. Officer Childs observed two young men riding their bikes at approximately 1 p.m. on a school day. Furthermore, he observed one of them go into a restaurant in a high crime area while the other waited directly outside the entrance with their bikes, and then the other one return from the restaurant without food. The two young men then rode across the parking lot to another fast food restaurant. The young men did not go into this second restaurant, but they rode off down an alley behind one of the stores in the area.

These facts, although not particularly suspicious, are remarkably similar to those found in *Terry* itself. They do, however, lack the repetitive nature of those found in *Terry*, at least in plaintiffs' version of the facts. Nevertheless, they also took place in a high crime area, and activities that are fairly innocuous in other areas may become particularly suspicious in areas of high crime. *See Illinois v. Wardlow*, 528 U.S. 119, 124–25, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Even if these facts are not sufficient to give rise to a reasonable suspicion, Officer Childs still had reasonable suspicion to conduct an investigatory stop solely on the grounds that the young men were truant from school.[6]

6. Michigan has a compulsory education law, which penalizes nonattendance and truancy. See Mich. Comp. Laws § 380.1561 ("[E]very parent, guardian, or other person in this state having control and charge of a child from the age of 6 to the child's sixteenth birthday shall send that child to a public school during the entire school year. The child's attendance shall be continuous and consecutive for the school year fixed by the school district in which the child is enrolled."); *id.* § 380.1599 ("A parent or other person in parental relation who fails to comply with this part is guilty of a misdemeanor, punishable by a fine of not less than $5.00 nor more than $50.00, or imprisonment for not less than 2 nor more than 90 days, or both."); *see also Sheridan Rd. Baptist Church v. Dept. of Educ.*, 426 Mich. 462, 396 N.W.2d 373, 403 n. 16 (Mich. 1986) (noting that Michigan's compulsory education statute "is not directly applicable to schools, but is a truancy law enforceable against parents"). Additionally, the Michigan statute that grants jurisdiction to juvenile courts specifically provides for jurisdiction over truants. See Mich. Comp. Laws § 712A.2(a)(4) (providing that juvenile courts have jurisdiction where "[t]he juvenile willfully and repeatedly absents himself or herself from school or other learning program in-

The second factor the court must determine is whether the degree of intrusion from the investigatory stop was reasonably related to the scope of the situation. *Hardnett*, 804 F.2d at 356. "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Defendants contend that Officer Childs brief detention of the King brothers, the pat-down search of Charlie, and the detention of Charlie in the police car were all unintrusive and reasonably related to the purposes of the stop. Because there is a question of fact with regard to these issues, we reverse the judgment of the district court on this claim.

Assuming that Officer Childs had reasonable suspicion to stop Charlie and Davon on truancy grounds, he still could have asked them several questions in order to clarify why they were not in school that afternoon. Moreover, we do not see any reason why Officer Childs was obligated to

believe the brothers' explanation that they had a half-day of school, and he could have detained them while he verified this explanation. Nevertheless, given the King brothers' version of events, Childs would not have acted lawfully in conducting a pat-down search of Charlie and placing him in the backseat of his vehicle. While placing Charlie in the backseat of the car for officer safety might not exceed the boundaries of a *Terry* stop, *see, e.g., United States v. Wellman*, 185 F.3d 651, 656 (6th Cir.1999); *United States v. Bradshaw*, 102 F.3d 204, 212 n. 19 (6th Cir.1996), and the length of the detention might not be cause for concern, *see, e.g., United States v. Sharpe*, 470 U.S. 675, 683, 686–87, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *Wellman*, 185 F.3d at 656, Officer Childs's had little basis for frisking Charlie, especially if he stopped Charlie only on suspicion of truancy. Even assuming that a frisk was permitted as a precautionary check for weapons, Officer Childs's grabbing of Charlie's "private parts" during the frisk, according to Charlie's version of the search, was highly intrusive and went beyond the purposes of the investigatory stop.[7]

tended to meet the juvenile's educational needs"). Though the state's juvenile statutes apparently do not independently provide penalties for truancy, in *In re Marable*, 90 Mich. App. 7, 282 N.W.2d 221 (Mich.Ct.App.1979), the Michigan Court of Appeals found that Michigan's abovementioned compulsory education law binds children, as well as their parents, and in so holding the court opened the way for a lower juvenile court to hold that the child concerned in the case was a juvenile delinquent due to her truancy.

7. Plaintiffs also assert that Childs and Clements did not act diligently during the course of the investigatory stop. One factor that the Supreme Court has considered in determining whether an investigatory stop is more intrusive than necessary is whether the police officers "diligently pursued a means of inves-

tigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the [suspects]." *Sharpe*, 470 U.S. at 686. The plaintiffs have not introduced any evidence that shows that Sergeant Clements acted without proper diligence. Immediately upon his arrival on the scene Clements spoke with each of the King brothers briefly, and then they were allowed to go. There is also little evidence to show that Officer Childs did not proceed with diligence. After stopping Charlie and Davon, he questioned them briefly, searched Charlie and placed him the backseat of the police car, and radioed for backup. The fact that neither of the officers radioed or called the school to determine if the brothers were actually truant, given the short period of the stop, does not show a lack of diligence sufficient to violate the Fourth Amendment.

Viewing this evidence in the light most favorable to the plaintiffs, we conclude that summary judgment was inappropriate because there remains a genuine issue of fact with respect to the reasonableness of the intrusion in the investigatory stop of Charlie and Davon.

To the extent that plaintiffs might be alleging that Chiefs DeWeese and Danbert as well as the City of Eastpointe may be held liable for Officer Childs's and Sergeant Clements's searches and seizures in the investigatory stop of April 4, 1996, summary judgment was proper. The plaintiffs have introduced no evidence that Chiefs DeWeese or Danbert encouraged any misconduct on the part of Childs and Clements, *see Bellamy*, 729 F.2d at 421, nor is there any evidence of an unconstitutional municipal policy pursuant to which the officers acted. *See Monell*, 436 U.S. at 694.

Defendant police officers assert that they are entitled to qualified immunity with respect to these claims. Having upheld summary judgment on the constitutional claims against defendants Clements, DeWeese, and Danbert, we do not need to discuss qualified immunity for those defendants. Officer Childs's search of Charlie, at least as Charlie has alleged it took place, however, does not warrant qualified immunity, as it would constitute a search that is unreasonable under the Fourth Amendment and would not be an objectively reasonable search by a police officer that would entitle the officer to qualified immunity. *See Feathers*, 319 F.3d at 848.

### D. September 30, 1996 Incident

#### 1. § 1983 Racial Discrimination Claim

Plaintiffs provide no argument in their briefs that Charlie King's arrest on September 30, 1996, was racially motivated in violation of the Fourteenth Amendment. Nevertheless, they do imply briefly that the only reason that Charlie was arrested was that he, like the second suspect of the assault and ethnic intimidation, was a "teenage African–American male." Pl. Br. at 53. Plaintiffs also include in their factual statement that while Charlie was at the police station he overheard someone say the phrase "we got those niggers." Pl. Br. at 20.

■ To the extent that plaintiffs argue that Charlie King's arrest of September 30, 1996, was racially discriminatory in violation of the Fourteenth Amendment, summary judgment was appropriate. Although there were whites present in Da Pizza Joint when Charlie was arrested, the record suggests that they were not arrested because the police had a witness's description of two black males. This fact militates against a finding of discriminatory effect. The plaintiffs have offered no evidence of discriminatory purpose except the allegation that one of the officers uttered "we got those niggers." As for that statement, plaintiffs have failed to introduce any evidence of who the speaker of the comment was, whether that person was affiliated with the police department or the City of Eastpointe in any way, or even the general context of the statement. Given the complete lack of evidence in support of racial discrimination in this incident, we affirm the grant of summary judgment for the defendants on these claims.

#### 2. § 1983 Search and Seizure Claim

The district court also properly granted summary judgment with respect to the Fourth Amendment claims based on the same arrest. Plaintiffs contend that Charlie's arrest on September 30, 1996, violated the Fourth Amendment because the police lacked probable cause for the arrest. Probable cause is defined as the "facts and circumstances within the officer's knowledge that are sufficient to

warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). In considering the totality of the circumstances, police officers must take into account both inculpatory and exculpatory evidence before determining whether probable cause exists to make an arrest. *See Gardenhire v. Schubert,* 205 F.3d 303, 318 (6th Cir.2000) (explaining that "the officer must consider the totality of the circumstances, recognizing both the inculpatory and exculpatory evidence, before determining if he has probable cause to make an arrest"); *Ahlers v. Schebil,* 188 F.3d 365, 371 (6th Cir.1999) (noting that where police officer is making probable cause determination, officer "cannot simply turn a blind eye toward potentially exculpatory evidence known to [him] in an effort to pin a crime on someone").

Plaintiffs assert that the police lacked probable cause for two reasons. First, there was insufficient inculpatory evidence for probable cause to exist to arrest Charlie. According to the plaintiffs, the only manner in which Charlie matched the description was that he was a teenage African–American male. With other teenage African–American males present at Da Pizza Joint, this fact, according to the plaintiffs, was an insufficient basis for probable cause. Second, plaintiffs assert that the police ignored exculpatory evidence in arresting Charlie. Specifically, the police did not consider the fact that Charlie was not wearing a tan colored shirt or jacket when the description given by Markham stated that the second suspect was wearing such an article of clothing.

Defendants argue that probable cause did exist for the police officers to arrest Charlie. They point to the quick response of the police to the report by Markham, the close proximity of the location of the arrest to the location of the alleged crime, Terrence Strong's exact match to the detailed description of the first suspect, and the police officers' observation of Charlie and Strong conversing in the restaurant before the arrest took place.

■ The district court properly found that probable cause existed in this case for the arrest of Charlie on September 30, 1996. The district court reasoned as follows:

The police did have probable cause to believe that Charlie, Jr., along with Strong, had committed a felonious assault against Markham. Although Charlie, Jr. was not wearing a tan shirt or jacket, the description Markham provided police of the second assailant, police had observed him talking to Strong inside the restaurant before police entered. Upon entering, the police found that Charlie, Jr., had moved to the opposite side of the restaurant. Police moved him back next to Strong, returning him to the position they had observed him from outside the restaurant.

Considering all the facts and circumstances within the officers' knowledge, Strong's exact match to the very specific description of the first assailant, the proximity of the reported felonious assault in time and place to the restaurant, the prompt arrival of police, and the observation of Strong and Charlie, Jr. talking to one another before the police entered, the officers did have probably cause to believe Charlie, Jr. was the second assailant involved with Strong in the reported assault of Markham. Despite the police having fingerprinted and photographed Charlie, Jr., there is no

dispute that he was released as soon as Markham said he was not an assailant.

Our review of the record confirms the district court's analysis. Plaintiffs argue that the police could not have observed Charlie and Strong talking inside the restaurant because Charlie testified that Strong did not "join" him. Assuming that Charlie did not "join" Strong, however, does not conflict with the otherwise uncontradicted testimony by the police officers (supported by Strong's testimony) that the police saw Charlie and Strong talking with each other before the police entered the restaurant.[8] Plaintiffs also assert that there were other teenage African–American males in Da Pizza Joint at the time of Charlie's arrest, and that this undermines the finding of probable cause. None of the testimony, however, indicates that any of the other teenage African–American males better matched the description of the second suspect. Given these facts, the district court properly determined that probable cause existed for the arrest of Charlie on September 30, 1996.[9]

Since we find that there is no evidence of a constitutional violation by the defendant police officers in arresting Charlie on September 30, 1996, we do not need to reach the issue of qualified immunity for this claim.

**E. February 28, 1997 Incident**

*1. § 1981 Racial Discrimination Claim*

■ The district court properly granted summary judgment on the claim of racial discrimination with respect to the February 28, 1997, investigatory stop of plaintiffs Martez and Charlie King. Plaintiffs claim that the police officers' actions on February 28, 1997, violated 42 U.S.C. § 1981 and the Fourteenth Amendment because, after receiving a report that "three black males" were dealing drugs to "four or five white girls," they investigated only the three black males. There is insufficient evidence to support such a claim, given that Officer Ostrowski did stop at the Eastland Liquor Store, did not see anyone in the alley or in front of the store,[10] and went in and spoke to the clerk who reported that there had not been a problem inside or outside the store. The plaintiffs have not introduced evidence of any practice targeting African–Americans or any other evidence indicating that individuals of different races were treated differently. Accordingly, we find the plaintiffs' claim that they were

---

**8.** While we must accept Charlie's testimony that Strong did not "join" Charlie, this does not contradict the officer's statement that he observed Charlie and Strong together in the restaurant before he entered. J.A. 266, 983, 984. In addition, Strong testified that Charlie had stood and talked with the seated Strong before moving to the other side of the room. J.A. at 978–79.

**9.** There is no argument that supervisory or municipal liability is appropriate for the actions of the police officers in arresting Charlie, and we therefore need not address the matter. Additionally, there is no evidence in the record of any encouragement or participation on the part of Chiefs DeWeese and Danbert in the arrest of Charlie on September 30, 1996, nor is there any evidence of a unconstitutional policy or practice which was

the "moving force" behind the officers' actions. *See Bellamy,* 729 F.2d at 421; *Monell,* 436 U.S. at 694.

**10.** We note that plaintiffs have introduced deposition testimony that indicates that the "white girls" were still outside the party store when they exited the store and drove off. This appears to conflict with Ostrowski's statement that he did not see anyone in front of the store or in the alley, although the exact timing of Ostrowski's arrival and the plaintiffs' departure is somewhat unclear. It is possible that the young women left during that period of time. In either case, the plaintiffs do not argue that Ostrowski failed to investigate the "white girls" when he stopped to investigate at the party store. Instead, they do not acknowledge that this investigation even occurred.

treated differently on February 28, 1997, because of their race in violation of § 1981 and the Fourteenth Amendment to be untenable, and therefore affirm the judgment of the district court granting the defendants summary judgment with respect to these claims.[11]

### 2. § 1983 Search and Seizure Claim

 There is, however, a genuine issue of fact as whether the ensuing investigatory stop was based on reasonable suspicion. Plaintiffs assert that Officer Keiser's stop of Martez King's vehicle on the evening of February 28, 1997 violated the Fourth Amendment and § 1983. Plaintiffs contend that summary judgment was not appropriate on this issue because there is a genuine issue of fact as to whether Officer Keiser had a sufficient basis to make an investigatory traffic stop. Specifically, plaintiffs allege that they were wearing their seatbelts at the time of the stop,[12] that the eight-ball air fresheners did not extend more than four inches from the top of the windshield, and that Officer Keiser could not have seen the crack in the windshield from behind the vehicle at approximately 9:15 p.m. on a February night. Plaintiffs have introduced the deposition testimony of both Martez and Charlie to show that they were wearing their seatbelts on the night in question. Martez has also testified that air fresheners did not hang more than four inches from the top of the windshield. Finally, plaintiffs have introduced expert testimony that would show that Officer Keiser would have been unable to see a crack in Martez's windshield.

Defendants do not respond to any of these factual claims, but instead rely on Officer Keiser's assertion that he stopped the plaintiffs because of the cracked windshield, visual obstruction, and failure to wear seatbelts. Defendants assert that these were traffic violations that occurred in Officer Keiser's presence, and therefore any detention of the vehicle would be constitutionally reasonable, citing *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). What plaintiffs are contesting, however, is whether these traffic violations did in fact occur, and even if they did occur, whether Officer Keiser could have observed them previous to making the stop. Defendant's reliance on contested issues of fact demonstrates that summary judgment was not appropriate for plaintiffs' § 1983 claim for this incident.

Summary judgment on the basis of qualified immunity was also not appropriate for Officer Keiser in this case. On the facts alleged by the plaintiffs, a constitutional violation would have occurred when Officer Keiser stopped Martez's vehicle without reasonable suspicion. Qualified immunity was however appropriate for the rest of the defendant police officers involved in the stop. Officer Keiser initiated the stop and gave the traffic citation to Martez, and there is no evidence that the other officers were involved in the decision to stop the car. The other officers would not be unreasonable in assuming that Officer Keiser had a sufficient basis to make the stop, and therefore are entitled to qualified immunity. *See Feathers*, 319 F.3d at 848. There is no argument by the defendants that the constitutional rights at issue in this case were not well established, and therefore we do not reach that issue.[13]

---

**11.** To the extent that plaintiffs might also be arguing for supervisory or municipal liability, there is no evidence to support such claims.

**12.** Failure to wear a seatbelt was not at this time a "primary" violation in Michigan.

**13.** To the extent that plaintiffs might also be arguing for supervisory or municipal liability, there is no evidence to support these claims.

## F. March 6, 1997 Incident: § 1981 Racial Discrimination Claim

Finally, the district court properly granted summary judgment with respect to plaintiffs' claims that the defendants failed to investigate sufficiently a racially motivated assault on Charlie, Davon, and Martez that took place on March 6, 1997. As the Supreme Court has held,

> nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

*DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). The Court went on to say that, "[a]s a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197.

There are two recognized exceptions to the general rule that a state's failure to act is not actionable under the Due Process Clause and the plaintiffs insist that this case fits within both of these exceptions. First, the plaintiffs assert that the defendants violated their Fourteenth Amendment rights under the "state-created-danger" theory, described in *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir.1998), by maintaining that the city failed to investigate earlier instances of racial intimidation and, therefore, created an "aura of permissiveness" for racially motivated violence. Secondly, the plain-tiffs argue that they have a "special relationship" with the police due to the history of encounters between the plaintiffs and defendants, and that because of this relationship, the defendants' failure to act violated § 1981. *See Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002) (explaining that in non-custodial settings state officials may violate Due Process Clause by increasing vulnerabilities of citizens or placing them in harm's way).

In order to establish that either of these exceptions apply, the plaintiffs must establish that there is state action and that there is a causal relationship between this action and the injury of which they complain. *Bukowski v. City of Akron*, 326 F.3d 702, 710 (6th Cir.2003). The plaintiffs fail to make such a showing. There must be state action prior to the injury and the plaintiffs complain of state action subsequent to the injury. Their complaint that the police failed to find Charlie's attacker then is not actionable because the state's failure to act was subsequent to the injury. Thus, it is impossible for the plaintiffs to make a showing that state action caused or exacerbated Charlie's injuries. In the absence of any causal relationship between Charlie's injuries and the state action, the plaintiffs cannot fit within either of the exceptions to the *DeShaney* rule.

Moreover, even if the plaintiffs could fit within one of the exceptions, they cannot prove liability under either. First, they cannot prove liability under the "state-created-danger" theory because it requires an affirmative act on the part of the defendants. Here, the plaintiffs challenge the defendants' *failure to act*, which cannot logically form the basis for liability under the "state-created-danger" theory. Secondly, the plaintiffs have not adduced any evidence showing that a "special relationship" existed between the state and the

plaintiffs. Typically, to fit within this exception, the state must have acted to create a relationship, such as taking an individual into custody. The relationship here, which consisted primarily of isolated conflicts between the plaintiffs and the police, is not the "special relationship" contemplated in *DeShaney.*

Finally, the plaintiffs have failed to introduce any evidence that the defendants acted differently towards the plaintiffs because of their race. It is certainly true that not every possible step was taken to investigate the plaintiffs' complaint, but the plaintiffs have not introduced any evidence that more investigation would have been done had the plaintiffs been white. The evidence that the plaintiffs provided to the police was not extensive, so it is not clear that more investigation would have been productive. The plaintiffs have also not asserted any particular acts, practices, or policies which resulted in the alleged discrimination. *See Davey,* 627 F.Supp. at 1462 (*citing United Black Firefighters v. Hirst,* 604 F.2d 844 (4th Cir.1979)).

Summary judgment was warranted because of the lack of evidence that a constitutional violation has occurred, and a discussion of qualified immunity for this claim is therefore not necessary.

Finally, with respect to supervisory and municipal liability, there is no evidence in the record of any encouragement or participation on the part of Chiefs DeWeese and Danbert in the investigation of the events of March 6, 1997, nor is there any evidence of a unconstitutional policy or practice which was the "moving force" behind the officers' allegedly deficient investigation. *See Bellamy,* 729 F.2d at 421; *Monell,* 436 U.S. at 694.

## CONCLUSION

For the reasons given above, we AFFIRM the district court in part and REVERSE in part. In particular, we AFFIRM the judgment of the district court granting summary judgment of all claims under §§ 1981 and 1983 with respect to defendants the City of Eastpointe, DeWeese, Danbert, Clements, Corsi, Genter, Gibson, Lulko, Margita, Ostrowski, Rohrer, Schoen, Scott, and Pryzwara. We REVERSE and REMAND for further proceedings only with respect to defendant Childs for potential violations of the Fourth and Fourteenth Amendments following the April 4, 1996, stop, and with respect to defendant Keiser for a potential violation of the Fourth Amendment in making the vehicle stop on February 28, 1997.

MOORE, Circuit Judge, concurring in part and dissenting in part.

While I generally concur with the majority, I respectfully dissent from the majority's holding that summary judgment was proper for the February 28, 1997, § 1981 selective-enforcement claim and the September 30, 1996, § 1983 claim. Additionally, I agree that the district court erred in granting summary judgment on the April 4, 1996, § 1983 intentional-discrimination and search-and-seizure claims, but I write separately to explain a bit more fully my reasoning.

First, summary judgment is not appropriate regarding the Plaintiffs' February 28, 1997, § 1981 claim. The plaintiffs have presented evidence that the officers pursued the three African–American males, but not the group of white females, allegedly involved in the drug activity outside the Eastland Liquor Store, which creates a genuine issue of material fact. The 911 caller told the dispatcher, "[w]e've got a bunch of boys that are dealing drugs out here," and later stated that "[t]here are three black males and four or five white girls." Joint Appendix ("J.A") at 405. After receiving a dispatch, Officer Keiser

pursued only Martez King's vehicle. The 911 call alerted the police to two suspect groups of different racial makeup, yet the police detained only the black males.

The majority suggests that the plaintiffs have not presented evidence to support this claim. It is true that neither Keiser's affidavit nor his police report from that night mention white females. However, Keiser's affidavit is extremely terse, and it is a reasonable inference, that we must take in the light most favorable to the plaintiffs on summary judgment, that the 911 dispatcher relayed the entire contents of the citizen's report to Keiser such that he knew about the white females. Second, the majority points out that Officer Ostrowski stopped at the store, did not see the white females, and spoke with the liquor store clerk who reported that there had been no problems outside the store (begging the question of why Officer Keiser continued to investigate and then proceeded to stop King's car if the liquor store clerk's report that no incident had occurred was enough to prompt police to cease searching for the white females). Given that it was Officer Keiser who allegedly received the report about the two groups and chose to investigate only one, it is not clear how Ostrowski's observations at the liquor store play a role. The plaintiffs have presented the necessary evidence to allow a reasonable jury to conclude that the police intended to and actually did discriminate on the basis of race.

Second, the question of whether the police had probable cause to arrest Charlie in the pizza parlor on September 30, 1996, involves a genuine issue of material fact that makes summary judgment improper. Taking the evidence in the light most favorable to the plaintiffs, we are presented with evidence that Charlie entered into "Da Pizza Joint" after Strong was already in the restaurant. Charlie arrived with several other African–American males, ordered pizza, and sat at a table on the opposite side of the restaurant from the couch on which Strong was resting. Charlie, who wore a black shirt, claimed that he did not speak to Strong in the pizza parlor and did not sit near Strong until the police officers ordered him to move. Based upon these facts, it is not clear whether there were "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense," *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979), because there was only scant inculpatory evidence linking Charlie to the assault on Markham, which was countered by strong exculpatory evidence. Charlie was allegedly one of several African–Americans in the pizza establishment, he claimed that he did not sit with or speak with Strong, and the shirt he was wearing was as far from tan on the color spectrum as possible. *See Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir.1999) ("[O]fficers, in the process of determining whether probable cause exists, cannot simply turn a blind eye toward potentially exculpatory evidence known to them in an effort to pin a crime on someone").

The majority reaches the opposite conclusion because it relies on the police officers' testimony that they saw Charlie and Strong talking and sitting next to each other through the restaurant window before the officers entered. Far from being "uncontradicted testimony," as the majority labels it, Charlie's deposition testimony clearly contradicts the officers' rendition of events. Yet, even if Charlie and Strong had been observed conversing and sitting side-by-side, only Charlie's skin color matched the description of the suspect available to the officers, and the officers appeared to ignore that Charlie was wear-

ing a different colored shirt than the perpetrator. Furthermore, the majority remarks that Charlie has not presented evidence that any of the other black males in the pizza shop "better matched the description of the second suspect." Op. at 808. Yet, it is not Charlie's burden to prove that other potential suspects better fit the limited description with which the officers were working; it is the responsibility of the officers to demonstrate they had a reasonable belief that Charlie was their target.

Third, I agree with the majority's holding that Officer Childs's use of the word "boy" gives rise to a viable § 1983 racial discrimination claim, but I employ slightly different reasoning. A § 1983 claim for racial discrimination at the hands of the police can be raised as a specific selective-enforcement claim or as a more general claim under the Equal Protection Clause; the former is a subset of the latter, and each has its own distinct, but related line of precedent. The framework for analyzing selective-enforcement claims filed against police officers descends from selective-prosecution cases. *See Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533–34 (6th Cir.2002) (holding that a plaintiff who alleges selective enforcement of facially neutral laws must demonstrate that the offensive enforcement " 'had a discriminatory effect and that it was motivated by a discriminatory purpose' " (quoting *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985))). Here, the plaintiffs' § 1983 claim is of the more general variety, and the plaintiff must allege that a state actor intentionally discriminated against him or her, although the plaintiff does not have to demonstrate a pattern of discriminatory action by the police; "[a] single invidiously discriminatory governmental act ... would not necessarily be immunized by the absence of such discrimination in the making of other comparable decisions." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 n. 14, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

The use of racially discriminatory language can provide some evidence of a discriminatory purpose when that language is coupled with some additional harassment or constitutional violation. The use of a racial epithet by itself is not an actionable violation of the Equal Protection Clause. *See Owens v. Johnson*, No. 99–2094, 2000 WL 876766, at \*2 (6th Cir. June 23, 2000) (unpublished Order) ("The occasional or sporadic use of racial slurs, although unprofessional and reprehensible, does not rise to a level of constitutional magnitude."); *Williams v. Bramer*, 180 F.3d 699, 706 (5th Cir.1999) ("[A]n officer's use of a racial epithet, without harassment or some other conduct that deprives the victim of established rights, does not amount to an equal protection violation.") Yet, "[t]he use of an epithet ... is strong evidence that a comment or action is racially motivated," *Williams*, 180 F.3d at 706, and evidence of racial slurs can support a § 1983 Equal Protection Clause claim when they accompany some other prohibited behavior. *Id.; Simmons v. O'Brien*, 77 F.3d 1093, 1094 n. 2 (8th Cir.1996); *Smith v. Thornburg*, 136 F.3d 1070, 1089–90 (6th Cir.1998) (Clay, J., dissenting) (asserting that alleged racial slurs standing alone form the basis for a equal protection claim); *Usher v. City of Los Angeles*, 828 F.2d 556, 561–62 (9th Cir.1987). Here, plaintiffs assert that Childs used a racial epithet in the midst of an allegedly unconstitutional seizure, calling Charlie "boy," a word that a reasonable jury could conclude was racially charged, given the totality of the circumstances. *See Booker v. Budget Rent–A–Car Sys.*, 17 F.Supp.2d 735, 743 (M.D.Tenn.1998). It is the confluence of a racial slur and a potentially illegal seizure that requires us to reverse the judgment

of the district court and remand for further proceedings.

Finally, for the April 4, 1996, § 1983 Fourth Amendment violation, both prongs of the *Terry* test, rather than just the second prong, are in dispute, because there was not a proper basis for the stop, considering the evidence in a light most favorable to the plaintiff and taking into account "whether the law enforcement officials were aware of specific and articulable facts which gave rise to a reasonable suspicion." *United States v. Hardnett,* 804 F.2d 353, 356 (6th Cir.1986). Both Officer Childs and Charlie testified that Childs stopped the teenagers on April 4 because "two black males had came over and stole bikes," J.A. at 861, although there is evidence presented by the defendants and relied upon by the majority that Childs conducted his investigatory stop "solely on the grounds that the young men were truant from school." Op. at 805 & n. 6. We must assume that Childs stopped the teenagers because he suspected they had stolen the bicycles, which I believe presents a genuine issue of fact regarding the reasonableness of the stop. While it may have been reasonable for Childs to have stopped two teenagers for truancy when he observed them around midday, it is not reasonable for Childs to have stopped the teenagers for suspicion of theft – when they did not engage in any other observed dubious behavior – merely because they were black and riding a bicycle.